SOUTHWESTERN GREYHOUND LINES, INCORPORATED,
v. GLADYS L. DICKSON.

No. A-2665. Decided January 31, 1951.
Rehearing overruled February 28, 1951.
(236 S. W., 2d Series, 115.)

600

*White, Taylor & Chandler, Q. C. Taylor, H. Grady Chandler* and *Kerns B. Taylor*, all of Austin, for petitioner.

The Court of Civil Appeals erred in failing to hold that the argument of counsel for plaintiff, contending that counsel for defendant had called plaintiff, who was a lady, by a number of improper names, was inflamatory and was a direct appeal to the sympathies of the jury, was improper and prejudicial, not having been invited or provoked by any such related improper argument of defendant. Said Court also erred in failing to hold that such line of improper argument and other similar state-

ments was not entirely cured by the court's instruction to disregard one of said statements. Pacific Emp. Ins. Co. v. Gage, 199 S. W. 2d 537; Southern Ice & Utilities Co. v. Richardson, 60 S. W. 2d 308; Texas & N. O. R. R. Co. v. Sturgeon, 142 Texas 222, 177 S. W. 2d 264.

*Critz, Kuykendall, Bauknight & Stevenson* and *F. L. Kuykendall,* all of Austin, for respondent.

The Court of Civil Appeals was correct in its holding that the argument complained of was justified from the statement of facts and the argument of counsel for the defendant. Trinity County Lumber Co. v. Denham, 88 Texas 203, 30 S. W. 856; Ochoa v. Winerich Motor Sales Co., 127 Texas 542, 94 S. W. 2d 416; Texas & N. O. R. R. Co. v. McGinnis, 130 Texas 338, 109 S. W. 2d 160.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

The writ of error in this personal injury suit of respondent, Miss Gladys L. Dickson, was granted in order to review her judgment against petitioner, Southwestern Greyhound Lines, Inc., (defendant below) in the light of petitioner's assignments of error based on (a) improper argument of counsel for plaintiff-petitioner and (b) jury misconduct. The Court of Civil Appeals sustained respondent's recovery. 228 S. W. 2d 232. In the latter part of last year we rendered our opinion, which is unofficially reported in 20 Texas Sup. Ct. Reporter, pp. 48 et seq., reversing and remanding the case on ground (b) above, without ruling upon ground (a). Thereafter, the plaintiff-respondent filed her motion for rehearing. The case has since been reconsidered on all points, with the result that the previous opinion is hereby withdrawn and the present opinion substituted therefor. Our conclusion is that, even should we have been in error in our view that jury misconduct was established, the case must yet be reversed for improper argument.

The opinion below gives a painstaking account of the argument, with extensive quotations from the remarks of counsel for petitioner, in addition to all of the allegedly improper remarks of counsel for the respondent. For a more complete statement of both, we refer to that opinion, though it contains nothing, which is at variance with the abbreviated reference hereinafter made and considered sufficient for the purposes hereof.

The relevant background of the evidence (as to which the opinion below is less elaborate) is substantially as follows:

There was testimony for the respondent that, in entering the bus station of petitioner at Austin, Texas, to become a passenger, she attempted to step over a long water hose lying on the bus driveway and, while astride the hose, was caused to trip by the negligent act of petitioner's servant in somehow raising it from the surface so as to catch respondent's following leg; that respondent thus fell forward, bringing her knees, hands and apparently some of the forward and side portions of her body into violent contact with the edge and flat surface of a walkway which lay about three feet ahead in her path and a few inches above the level of the driveway; that respondent thus broke her right kneecap and was thereby, and as a general result of the fall, severely and permanently injured also in her right hip, sacroiliac joint and vertebrae, resulting in shortening of her right leg, spinal curvature, excessive nervousness, anemia, loss of appetite, rapid exhaustion, and a continuing sense of general bodily pain, all of which caused a serious partial disability for many ordinary activities of life and total incapacity for various kinds of intellectual occupations, which she had at one time or another followed. Except as to the mere fall and kneecap fracture, requiring the surgical repair that shortly followed and resulting in slightly limited knee action, virtually all essential facts of respondent's claim were flatly disputed. This was especially true as to the nature and extent of the alleged injuries and disability, and conflicting medical testimony and testimony of respondent on this subject constituting the bulk of the statement of facts. Particularly important in this latter dispute was the alleged specific injury to respondent's back, which appears to have been her principle claim for damages, and, as to which, despite her testimony of constant general pain and of having consulted various physicians in Waco and Austin, she seems not to have made any definite complaint or to have had any knowledge until some two years after the accident when, according to her testimony, a naturopath, whom she consulted but did not call as a witness, "discovered it through the reflexes". His diagnosis appears to have been affirmed about the same time by Dr. Joe Love, an osteopathic physician, who never treated her at any time, but who took a series of X-rays and testified from them as a principal witness for petitioner. During the period of over two years between February 4, 1946, when the accident occurred, and the date of the trial now under review, respondent evidently did, to a limited degree, things such as going about from place to place, driving an automobile, doing special teaching work and taking a course in creative writing at Baylor University. During the few years before the accident respondent weighed

around a hundred pounds and had been treated on a few occasions for anemia or general debility, her weight continuing more or less the same after the accident. A principal witness for petitioner was Dr. Will Watt, an Austin surgeon, who, evidently at the behest of petitioner, but at the expense of respondent, attended respondent immediately after the accident and within a week thereafter did the above-mentioned surgical work on her injured knee, in connection with which she was under his daily care in an Austin hospital for some six weeks thereafter. Once later on in the same year, and once in June of 1947, respondent, at petitioner's request, came to Austin from her then residence and was re-examined by Dr. Watt. Still another examination occurred in late May 1948, during a previous trial of this case, when Dr. Watt was apparently informed for the first time that respondent was claiming an injury to her back. He then made an examination of some fifteen or twenty minutes without benefit of X-ray pictures and suggested that for the purpose of determining whether a back injury existed, respondent should be forthwith photographed by a particular X-ray specialist; the request being refused, on advice of respondent's counsel, apparently for the reason that Dr. Watt had arrived at noon (about an hour late for the appointment) and there was accordingly insufficient time within which to take the picture before court should reconvene. Dr. Watt testified, without any record indication of bias, that, while disappointed over the limited disability of respondent's knee existing so long after his otherwise successful operation, he did not believe, and until the 1948 examination never had any occasion to suspect, that respondent had suffered any other injury from the accident, and could not form a sound opinion about her back from the X-rays taken for her by Dr. Love and without the additional X-rays, which had been refused. He freely admitted to being a "surgeon", and, in explaining his lack of independent recollection of certain factual details, mentioned in an evidently casual way, that he performed about a thousand operations a year. He stated without hesitation, in answer to a question of respondent's counsel, that he had been shown a copy of a letter from petitioner's counsel to some other doctor regarding respondent's condition. In answer to a general cross question as to whether the presence of great pain after the accident plus the absence of pain before the accident did not make the pain a probable result of the accident, he answered in effect that the question was academic, and so he would just say he did not know. Aside from this reply to a question, which was somewhat involved with the fallacy anciently called "post hoc ergo propter hoc", the record reflects nothing about the

doctor, his testimony or his connection with the case which might normally provoke extremely harsh treatment from respondent's counsel. It also appears that the claim agent of petitioner took a written statement from respondent at the hospital, at a time when, as she testified, she was under the influence of narcotics, though this latter condition was not shown to have been known to the claim agent. No copy of this statement was given respondent or requested by her.

■ The more vital portions of the argument in question are from the closing statement for respondent and described below:

(a) That part (made in reply to petitioner's argument in effect impunging the credibility of some of the testimony given by respondent herself) reading as follows: "Who is this woman here? Is she a liar? Is she a cheat? Is she a fraud? They would have you believe that she is an imposter; that she comes from a distant land * * *" (and after objection, which was evidently overruled, that no such epithets were used by petitioner's counsel, etc.) "They have said in their arguments, 'What is her motive? Why did she testify to that;' that you should carefully weigh her motives. If that is not challenging her honesty and integrity, I don't known how they can express it in stronger words. Mr. Taylor in his closing argument said, "No, she doesn't want to get well; she wants to wait until this lawsuit is over, and then she is going back to school.' If they said that about your wife or daughter, or if they said it about my wife, who had been injured as I believe this woman is, I think I would take it as a challenge to her honesty and integrity." (Objection here evidently overruled) "she came back to Waco, * * * and the trustees there * * * didn't think she was a cheat; they didn't think she was an imposter.. * * * I am telling you these things because they (petitioner and its counsel) have accused this woman of being a liar, of being a malingerer, of being a faker." (Another objection evidently overruled) "I am telling the jury you don't believe what she said. If that is not calling one a liar, I don't know what you would call it."

(b) The part containing the following: "Now, Dr. Watt I am sure is a skilled surgeon. He says he devotes practically all of his time to it. I agree with them that he is a good cutting doctor; * * * That June 5, 1947 examination was another one of those 15 or 20 minute examinations. The woman was suffering untold pain and he took that much time. He didn't want to waste time doing those things, because he was looking for whittling flesh; that is what he wants. He is not interested in giving a diagnosis; he was a cutting doctor." * * * He devotes

practically all of his time to surgery. You recall Dr. Watt was very nice here,—he said Miss Dickson was very co-operative, and they got along fine. Oh, yes, she had a little fracture on her knee. It was not bad,—a little fracture; but he socked her $350 for it. Yet he says it was nothing. He took 17 stitches on her knee and charged her $350.00; but now that is nothing,— just a little thing. And finally on direct examination the last thing he said was, 'I don't think anything is wrong with her.' Well, I am reminded of a story in that connection that I think is very appropriate,—the story about the boy out fishing and he hooked a five or six-pound catfish, and the fish flopping around in the boat and he was trying to catch him to get to work on him, and finally the boy said, 'what's the matter, honey, I ain't going to do nothing to you except cut your guts out.' * * * That is exactly what I say Dr. Watt has done in this case. * * * I said, 'Doctor, isn't it a fact that you saw some of this correspondence between Mr. Taylor and me?' Why was Dr. Watt so interested? I can tell you why. He ought to be getting some of the attorney's fees in this case, in addition to his medical fees. * * * Of course he could not practise law, but his very actions on this witness-stand show that he is not a fair and impartial doctor; he is an advocate; or why was he so well informed about this re-examination correspondence between Mr. Taylor and me." (Several objections were duly made and disregarded as to the foregoing, though the court did instruct the jury not to consider the part saying that Dr. Watt should have gotten attorney fees for his part in the case).

(c) The following with reference to the statement of respondent taken by the claim agent: " 'And they did not have the common decency to leave a copy of the statement signed by her with her. That is the kind of cattle you are dealing with.' " (objection was sustained to this statement, and the jury was asked not to consider it).

The difference between this court and the Court of Civil Appeals is that the latter considered the argument in question as "borderline", while we think it crossed the border. The "great latitude" permitted counsel of both parties to indulge in "flights of oratory" has its limits, which should probably be guarded more than ever, now that the abolition of the jury in civil cases is being openly suggested in the name of more scientific justice by some jurists, who say that the jury trial is now largely restricted to criminal cases in the nation in which our jurisprudence originated. See, for example, Frank, "Courts on Trial", (Princeton Univ. Press, 1949). In his

"Manual on Jury Argument in Texas Courts", the late and much lamented Earl Cox of the Houston bar lists twenty four general types of argument that in a given case may involve error, including "15. Criticism, censure or abuse of parties or witnesses. 16. Abusive language and criticism in general; opphrobrious terms and expressions * * * 21. Appeal to passion and prejudice generally. 22. Appeal to sympathy generally." See also Cox, Errors in Jury Argument, 6 Tex. Br. J., 536. While this court has had to decide few clear instances in which an argument, otherwise bearing some logical relation to the case, is yet said to be improper by reason of its disproportionate appeal to passion or prejudice through the use of excessive or inflammatory language or concepts, there is little doubt that such argument is to be condemned under the principles of the following decisions, whether in a given case the error was or was not held justified or without prejudicial effect. The Texas Company v. Gibson, 131 Texas 598, 116 S. W. 2d 686; Ragsdale v. Ragsdale, 142 Texas 476, 179 S. W. 2d 291; Woodard v. The Texas & Pacific Ry. Co., 126 Texas 30, 86 S. W. 2d 38; Safety Casualty Co. v. Wright, 138 Texas 492, 160 S. W. 2d 238; Smerke v. Office Equipment Co., 138 Texas 236, 158 S. W. 2d 302; Humphreys v. Roberson, 125 Texas 558, 83 S. W. 2d 311; Fambrough v. Wagley, 140 Texas 577, 169 S. W. 2d 478. Whether we say that an excessive appeal to passion or prejudice is wrong for that very reason or because, in theory or actual fact, it goes "outside the record" or violates the court's instruction that the jury shall be guided by the evidence, the result is the same; and there can be but a small difference between the error involved in the "Golden Rule" type of argument or the type in which emphasis is laid on the obvious corporate character or nonresident status of a party or the generally obvious disparity of economic standing between the parties and, on the other hand, an argument which makes its appeal for favor through passion or prejudice aroused by abuse, "name calling", or other types of excessive language. It is, of course, common knowledge, that while people often contend peaceably over contradictory versions of a fact, the element of reason is usually replaced by that of violence, once inflammatory language, and especially names such as "liar" are employed. Undoubtedly there is no absolute rule against expressing even a highly unfavorable opinion of an opposing party or witness. Davis v. Hill, Tex. Com. App., 298 S. W. 526. But the salutary right of counsel thus to speak his mind is subject to obvious limits, which excessive language may exceed—either by connoting an idea or fact without support in the record or by its very character as inflammatory. That these limitations apply to attacks

on opposing counsel and witnesses as well as those on opposing parties has, for good reason, rarely been questioned. While argument otherwise excessive or improper under the above rules has been held justified by similar argument or other type of "invitation" previously emanating from the opposing side, obviously this is so only when the relation between the argument under attack and the alleged provocation is one of reason and fairness. See Woodard v. Texas & Pacific Ry. Co., The Texas Company v. Gibson, both supra. Otherwise counsel might well hesitate to use even the politest criticism for fear of justifying an unrestrained reply or, on the other hand, both sides may properly elect to abandon all restraint.

The Court of Civil Appeals considered argument (a) above to be justified by the preceding argument for petitioner. The pertinent portion of the latter (set forth in detail in the opinion below) in substance attacked respondent's statements both as to the manner of the accident, the fact of her back injury, and the great degree of her disability as untrue. As to her disability, a lack of good faith was probably also charged. All this we consider that, under the evidence, counsel had a right to do. Davis v. Hill, supra. Their language was not unrestrained and was about as respectful as the issue under discussion permitted. They used no epithets of "liar", "fraud", "faker", "cheat", or "imposter". It is one thing to say a woman has not told a true story or that "she doesn't want to get well". It is altogether another to call her names—such as "liar". Petitioner's counsel were entitled to make the argument they did make without thereby necessarily subjecting themselves and their client to what was in effect the inflammatory and unfair charge of insulting a woman. Such a charge in the language employed was actually more inflammatory than if counsel making it had called petitioner's counsel, witnesses or servants the same names above mentioned. The repeated objections to it should have been sustained.

■ The argument concerning petitioner's witness, Dr. Watt, was still less justifiable. Nothing in the testimony or in the argument for petitioner gave reasonable cause for the exaggerated and inflammatory remarks of counsel, which were quite susceptible of the interpretation that the witness was unfaithful to his high profession and even a person of inhuman instincts. That a physician happens to be a busy surgeon and to have performed a necessary operation on the respondent's knee is certainly no excuse to suggest that his diagnoses were influenced by a desire "for whittling flesh" and that he had the same

jocular regard for a serious operation of a human being as the rough and ready fisherman had for "cutting the guts out" of a fish. The extreme and overly colloquial character of the words permeating the passage in question were—especially in a case involving a delicate female patient—both unfair and much more likely to arouse passion and prejudice than to convince the minds of the jury. Our democratic processes will indeed not be wrecked by an occasional and amusing "fish story", but humor misplaced is far·worse than none at all, while stories that harbor error may be the more dangerous for the palatable ˑhumor with which the error is coated. That the trial judge heeded the various objections of petitioner to the limited extent of ruling out the statement that Dr. Watt should get part of the attorney fees did not under the circumstances operate to "cure" even that particular part of the argument, which, after all, was but cumulative to the abuse already permitted.

■ The reference to petitioner's personnel as lacking in "common decency" and as "cattle" was also improper. No law or universal custom requires persons taking written statements from others to give the latter copies, even should a copy be requested, as evidently it was not here. The omission of petitioner to give a copy, therefore, was far from justifying the abusive and inflammatory language quoted. Had this been the only objectionable argument in the case, doubtless the instruction of the trial court to disregard it would have rendered it harmless under decisions such as Ramirez v. Acker, 134 Texas 647, 138 S. W. 2d 1054. But not every improper argument may be thus "cured". Robbins v. Wynne, Tex. Com. App., 44 S. W. 2d 946. Smerke v. Office Equipment Co., supra. The effect of such language is quite as difficult to remove by a mild instruction to disregard it as is the effect of bringing in matters outside the record. Under the circumstances of this case, we consider the vice of the argument not to have been cured.

■ This brings us to the matter of whether the impropriety of the argument probably influenced the verdict unfavorably to petitioner—a question which, like that involving many other types of error ,is to be determined as a matter of our judgment in the light of the record as a whole. See Texas Power & Light Co. v. Hering, 148 Texas 350, 224 S. W. 2d 191, 192. Clearly material to such consideration is the entire portion of the argument available to us, including the aggregate effect of "borderline" statements of respondent's counsel, which, while each in itself improper argument, may yet be taken to enhance the effect of those which are definitely improper.

Smerke v. Office Equipment Co., supra. The existence of various such comments appears from the portions of the argument herein quoted and from the opinion below to which reference is again made. Considering these matters, as well as the largely factual character of the case as heretofore described, and the closeness of the various fact issues, our best judgment is that petitioner probably suffered prejudice.

The judgments below are reversed and the cause is remanded to the District Court for another trial.

The motion for rehearing is overruled.

Opinion delivered January 31, 1951.

Associate Justice Wilson not participating.

Rehearing overruled February 28, 1951.