GARWOOD, J., joins in this opinion.

### LOPER et al.

v.

### LUMBERMEN'S LLOYDS.

No. 4951.

Court of Civil Appeals of Texas.

Beaumont.

May 7, 1953.

Rehearing Denied Dec. 17, 1953.

Rehearing Denied Feb. 17, 1954.

Faver & Barnes, Jasper, for appellants.

Collins, Garrison, Renfrow & Zeleskey, Lufkin, for appellee.

WALKER, Justice.

This is a Workmen's Compensation case. Appellee was the insurer. Ed Loper was the workman, and this proceeding was brought by his widow and minor son. The claimants are Negroes. They are referred to hereafter as the plaintiffs, and the appellee, as the defendant. The cause was tried to a jury, and on their verdict judgment was rendered that plaintiffs take nothing. Plaintiffs have appealed from this judgment.

The Points of Error which are material assign error to arguments made to the jury by defendant's counsel, and the following statement concerns the subject matter of these points.

Ed Loper was an employee of the Bon Wier Lumber Company at the time when plaintiffs claim that his injury occurred. He worked in a lumber mill adjacent to the saw. He is referred to in the proof as the "sawtailer," and the nature of his duties is not wholly clear; but he seems to have separated the pieces of a sawed log which could not be made into lumber from pieces which could, and to have sent the usable pieces down a conveyor to the next machine, which was called the "edger". On the morning of February 9, 1951, while he was at work, he suddenly left his place of work with pain in his right side, and later that day was sent to a local physician by the superintendent of the mill. He never returned to work. The physician to whom he was sent concluded that an operation was necessary and he sent Ed Loper to a hospital in Galveston. Ed Loper was admitted to this hospital on February 10 or 11, 1951. A surgical operation was performed on his abdomen and it was found that he had a ruptured duodenal ulcer which had, however, sealed spontaneously. The cause of this ulcer was not proved. Ed Loper remained in the hospital under treatment until March 24th. He then returned home and remained there for a short time. While at his home he conferred with plaintiffs' counsel and seems to have made claim for compensation under the Workmen's Compensation Law, Vernon's Ann. Civ.St. art. 8306 et seq. He was examined there by Dr. Seale. This physician ordered him back to the hospital in Galveston, and he re-entered that hospital on April 21st. He died on the day following. An autopsy, participated in by the physician who had performed the original operation and had treated Ed Loper, showed that Ed Loper's

death was a consequence of processes which the rupture of the ulcer had started.

There was no dispute about these facts. It was shown, therefore, as a matter of law, that the termination of Ed Loper's employment on February 9th and his death about two and one-half months afterward were caused by the perforation of the ulcer; and the cause of the ulcer was not proved.

Plaintiffs' demand is founded on the claim that Ed Loper was struck in the right side by a big piece of a sawed log immediately before he left his work on February 9th and that this blow ruptured the ulcer. Whether Ed Loper actually did sustain this blow was, in effect, submitted to the jury in Issue 1. This issue inquired whether "Ed Loper sustained an injury on or about February 9, 1951"; and the jury found that he did not. This answer determined the result of the suit and made it unnecessary for the jury to answer any other issue except the issues pertaining to Ed Loper's wage rate.

Three of Ed Loper's fellow workmen testified about what happened to him on February 9th. One of these, Sandy Brooks, testified in behalf of the plaintiffs. Thus, the foundation of plaintiffs' case may be said to have depended on the testimony of this man. The other two, Bodie Dean and R. C. Cooper, testified in behalf of the defendant.

These three witnesses, Ed Loper, and another person who died before the case was tried worked in that part of the mill where logs were cut into merchantable lumber. All of the various steps in the process by which this was done occurred at a track on which a carriage ran. This track was 60 or 70 feet long; the evidence is indefinite. At one end, which we will call the right end, a log was moved from a structure called the "log deck" on to the carriage and properly placed there for sawing. Bodie Dean did this; he was called the log "tripper". At Bodie Dean's left was the sawyer and still farther to his left was the saw. R. C. Cooper was the sawyer. The carriage bearing the log moved to the left past the saw and the log was cut into boards by the saw. Beyond the saw on the left, but near it, worked the "sawtailer". The "sawtailer", as we have stated, was Ed Loper and he stood in a hole to do his work. At his left was the "edger". The carriage, bearing the boards made by the saw, moved toward the left past Ed Loper, who apparently separated the useless boards from the usable boards, and continued on to the "edger". This was the machine which sawed the rough boards into merchantable lumber. The person who operated it was called the "edger man". Beyond the "edger" and at the left end of the track was the "trimmer". This was the machine which cut the lumber into the length desired. It was served by two men. The person who operated it was called the "main trimmer man"; this was Sandy Brooks. The other was Brooks' assistant and was called the "strip catcher".

All of these workmen except R. C. Cooper were Negroes. Of these various employees, the "edger man" was dead when the cause was tried and the "strip catcher" did not see what happened.

Of the other three, who did testify, the two who testified for the defendant were at or near the right end of the track, and on Ed Loper's right side, while the one who testified for the plaintiffs was at the left end of the track, on Ed Loper's left. The evidence concerning the distance at which defendant's witnesses Bodie Dean and R. C. Cooper worked from one another and from Ed Loper is in conflict. According to Bodie Dean, he worked very near Mr. Cooper and about 10 feet from Ed Loper. Mr. Cooper estimated his distance from Bodie Dean at about 10 feet and his distance from Ed Loper at about the same. Mr. Enos estimated Bodie Dean's distance from Ed Loper at about 15 feet. At any rate, these two witnesses were only a short distance from Ed Loper and at the right of Ed Loper. Sandy Brooks estimated the distance between him and Ed Loper at about 50 feet but R. C. Cooper estimated this distance to be 60 feet. Each of the three witnesses said that he saw what happened to Ed Loper.

Sandy Brooks testified that a big slab struck Ed Loper on the right side immediately before noon. He said: "I could see him all the time. I looked and watched for logs * * *. See what the sawyer makes * * *. Seed the log. I set my trimmers * * * that was my job * * * when it comes to me. I seed everything that was done." Further: "See him—I reckon I seed him—just like I am looking at you." Further: "Q. I want you to tell the jury in your own way what happened there. A. Gentlemen of the jury, now, at 11:55—Q. You can sit down. A. I seen Ed Loper catch holt of a big slab, coming from a big green log—I remember it was a gum or oak, I know it was a big old gum or oak log. He caught that slab—went to twist it to put it on the conveyor to go on down, and by that time another one come, by that time. I seen that big slab—when he wheeled that over that way, it hit him right in the side. I was looking at that like I am looking at you." Further: "When the first slab come up he caught that big slab—there was some more coming; but he failed to catch it—he held that big slab. * * * when he tried to lift it off—when he turned it loose—I knowed he couldn't do it—he kneeled down." Further: "* * * he didn't handle the slabs no more."

Sandy Brooks said that when the noon whistle blew, he went to Ed Loper; that Ed Loper was holding his side and was kneeling; and that he assisted Ed Loper to go into the filing room and made a pallet there for him, where Ed Loper lay down. He said that while this was being done, Ed Loper told him "that slab got him", and that Ed Loper complained of pain while in the filing room. He said that after a short time, some others carried Ed Loper to the boiler room, and that he was later taken to the office and then to the hospital. He said that at the end of the day he went to Howard Enos, whom he called the foreman (Mr. Enos was the superintendent of the mill; the witness Cooper was the foreman) and inquired about Ed Loper, and that he told Mr. Enos of Ed Loper being struck by the slab.

The testimony of defendant's witnesses,. Bodie Dean and R. C. Cooper, was in flat conflict with that of Sandy Brooks. These two witnesses said that they were looking at Ed Loper when he left his work; that he was not struck by a piece of log; and that he did not kneel. According to them, and another witness, whose testimony is referred to later, Ed Loper said nothing to them of an injury or blow.

Bodie Dean testified that in doing his work "I face the sawtailer—look right at him." He was some 9 or 10 feet from the sawtailer "—looking right at him.—I got to see him; yes, sir; I had to see the sawtailer, where he was. I had to see him." He said: "The log tripper have to watch the sawtailer to keep from getting killed hisself,—to keep boards from coming back on him." He said: "Well, I saw * * * when he got sick * * * when Ed Loper took sick * * * Ed Loper * * * took sick right at noon; and he grabbed his stomach * * * grabbed his stomach and come out of the hole * * * backed up out of the hole. Lay down at the water barrel * * * I went to him. I told him,. 'you better get some medicine, boy; you are sick.' He ain't said nothing to me." (It was a little later, at dinner time, that he went to Ed Loper). The hole he mentioned was that in which Ed Loper stood to do his work. He said: "Before he laid down he grabbed his stomach. * * * when he backed out of the hole he grabbed his stomach." He said "he didn't fell down to his knees. I was looking at him." He said that he did not see Ed Loper get hurt that morning.—"Didn't see 'air' piece of timber strike him." On cross examination he testified "that slab didn't hit him.— it wasn't no big slab. We didn't have any big slabs.—He didn't get hurt." Further: "I know he took sick. Nothing didn't hurt him." Further: "He backed up—he didn't fell out." Further: "The slabs go on down the roller bed; you don't have to handle slabs. They roll on down and fall off.— He didn't have to handle them.—He could put his hand on them; he didn't have to handle them."

R. C. Cooper, the sawyer, who was also the foreman of the mill, had his place of work as sawyer within 10 feet of Ed Loper. According to Mr. Cooper's testimony the incident happened during the morning but not as near noon as Sandy Brooks and Bodie Dean said. He testified that as sawyer "you face kinda toward the carriage, but as the carriage goes down on that end of the track you are watching the sawtailer directly all the time." Further, there was "not a thing in the world" to obstruct his view of Ed Loper, "only a wire screen and it has about 3/8ths inch mesh on it and anybody can see through it." Further: "It was my job to watch the sawtailer, it was my job to watch the carriage crew and the log tripper." Mr. Cooper said that he saw Ed Loper when the latter left his place of work. "Well, the mill was running. We was sawing, whipping back and forth. So, Ed, he just stepped back out of the hole; he kinda grabbed his side. So, I have a boy that helps me; so, I called this boy up there to relieve me while I could see what was the matter and go get another man to put in Ed's place."

After this assistant arrived "I went over to talk to Ed. Ed Loper had backed off about 8 or 10 feet, I reckon—I had a little old work bench, and he was kinda leant up—the best of my knowledge—leant up on the work bench." Ed Loper was not sitting down or reclining. He talked with Ed Loper. He asked what was wrong. "Well, Ed Loper told me that he had been bothered with nervous indigestion—He told me he was bothered with nervous indigestion, so, I told him to go over and lay there, maybe he would feel better in a few minutes. He kept laying around there. That was somewhere between 9 o'clock and noon. Well, he didn't seem to be getting better and around noon I sent word for Mr. Enos to carry him to the doctor * * *." Ed Loper did not say anything about a slab or piece of timber striking him, and said nothing about getting hurt while behind the saw, or about having any kind of an accident, or about any injury received while tailing the saw. Ed Loper said nothing to him except that he had nervous in-

digestion. After that Ed Loper went out to the boiler room and lay down awhile.

Mr. Cooper concluded his direct examination with the statement that Ed Loper did not get hurt there that morning. On cross examination he testified: "When a man quits a job and backs up out of his way, you got to find where the trouble is and replace him." He didn't know whether Ed Loper had been hurt (when he went to Ed Loper), but he saw Ed Loper going over there with his hand on his side, and concluded that something was wrong. "I never did stop the saw." He said that when he went to Ed Loper, the latter "wasn't complaining a bit." Ed Loper was leaning up there. He said that "he wasn't lifting any slab" before stepping backward. He would say that a heavy slab did not strike Ed Loper in the abdomen. He would say that Ed Loper didn't handle and lift a piece of timber when this pain hit him. "I know he didn't get hurt, because I was positively watching him all the time." He didn't know that Ed Loper was carried away from there in a serious condition. "He wasn't taking on." He said: "I do know what happened." He could say that Ed Loper did not lift a heavy timber or a heavy slab and injure his abdomen. He said "if he had got hit I would have saw him."

Howard Enos, superintendent of the mill, said that on the last day when Ed Loper worked he (that is, Mr. Enos) went out to the plant just before noon; that he generally makes a round over his mill and planer and that on this occasion he went on "a general round" to see that everything was going on correctly; that he saw Ed Loper at the plant; that Ed Loper was sitting down in the back end of the mill, approximately 50 feet from his usual place of work and "just about opposite where the trimmer man works"; that Ed Loper was sitting "kinda drawed over"; that he asked Ed Loper what was the matter with him; that Ed Loper "told me he was sick at his stomach"; that this was all Ed Loper said; that he asked Ed Loper "did he think he would feel better"; that Ed Loper made no complaint except of being sick at his stomach; that Ed Loper said nothing about

a slab hitting his stomach or side, or about getting tangled up in that circular saw, or about falling down to his knees, or anything about an accident of any kind, or anything about getting hurt in any way. He said that Ed Loper did not want to go to a doctor but that he later sent Ed Loper to a certain local physician.

There was testimony from defendant's witnesses that Sandy Brooks, in performing his duties, would not look toward Ed Loper, but would face partly away from Loper, who would be toward his left and partly behind him. See the testimony of Bodie Dean at pages 159 and 160, the testimony of R. C. Cooper at pages 183 and 184, and the testimony of Howard Enos at page 212 of the Statement of Facts. Furthermore, there was evidence that Sandy Brooks' duties would have required much the greater part of his attention. See the testimony of R. C. Cooper at pages 184 and 195, and the testimony of Howard Enos at page 240 of the Statement of Facts.

It is not apparent to us how Sandy Brooks could have performed his duties without observing the lumber coming toward him. He had to adjust his machine to cut this lumber, and he had to make this adjustment before the lumber arrived at his machine. This necessarily compelled him to look toward Ed Loper because that was the direction from which the lumber came to Sandy Brooks. There was some testimony by defendant's witnesses R. C. Cooper and Howard Enos to this effect, showing that Sandy Brooks' duties would not have prevented his seeing Ed Loper or even made it improbable that he did so. See the testimony of R. C. Cooper at pages 194 and 195 and the testimony of Howard Enos at page 240 of the Statement of Facts. This evidence, of course, qualified that which is mentioned in the paragraph immediately preceding.

It seems to us that the nature of Bodie Dean's duties prevented his looking constantly toward Ed Loper. The log deck from which the logs came to the carriage formed a right angle with the track on which the carriage ran and Bodie Dean worked near the point of this angle. The performance of his duties obviously required him to give attention to the log deck on his right and to the carriage in front of him. Ed Loper, however, was at his left. Mr. Cooper's duties also prevented his giving constant attention to Ed Loper. Thus, Mr. Enos, the superintendent, said: "The sawyer controls the movement of the carriage, and he is looking right at the saw all the time. It is directly in front of him." He said further that the sawyer "don't exactly watch the saw, he watches all that is going on." Mr. Cooper said that he, too, had a full time job but "it was my job to watch the sawtailer; it was my job to watch the carriage crew and the log tripper." The log tripper was on one side of Mr. Cooper and Ed Loper was on the other. There was, then, some criticism which could have been made of the claims by Bodie Dean and R. C. Cooper that they were watching Ed Loper.

The only other testimony relevant to the question, whether Ed Loper was injured as plaintiffs claim, was given by the local physician who examined Ed Loper on the day when the latter stopped work and by the Galveston physician who operated on Ed Loper and participated in the autopsy. The local physician found Ed Loper to be suffering from severe pain. He said that he found no evidence of bruises or abrasions in the region of Ed Loper's abdomen and saw no evidence of his being struck by a piece of timber or lumber. He said that Ed Loper told him nothing about having been involved in an accident and "he didn't come as an industrial accident to us." It was his opinion that a blow hard enough to rupture a duodenal ulcer would have left a mark on the body. The Galveston physician saw Ed Loper first on February 11th, shortly after midnight. This was either a few hours more than or less than two days after Ed Loper stopped work. He found Ed Loper to be "clinically ill and in a very serious condition." It was his opinion, given in response to a hypothetical question which included plaintiffs' theory of Ed Loper being struck by the slab, that this incident was in reasonable probability the

cause of Ed Loper's death. He said that Ed Loper gave a history of his condition on entering the Galveston hospital. This history related previous pains and stated that Ed Loper developed a sharp pain in the right side of his lower abdomen while he was at work on February 8th which compelled him to stop work. However, the witness had no record of Ed Loper telling him about having been hit by a slab or piece of timber, and said that if Ed Loper had told him this he would have written it down.

This completes our summary of the evidence bearing on the question, whether Ed Loper was injured. The following matters bear on certain statements made in the argument which is under review.

The plaintiffs are a Negro woman 55 years old, and her minor son, 11 years old. Proof was made, and not contradicted, that they were in debt and without funds, and that financial assistance had been given them by their church.

The plaintiff, Cora Loper, testified, in substance, that after Ed Loper had returned home from Galveston and while he was at home, he (or she) wanted to make a claim for his injury, but he was too ill to leave home; that she sent word to one of the counsel who represented her on the trial of this case requesting him to come to the house; and that he did come to her home in response to this message, talk with Ed Loper, and prepare a claim for compensation in behalf of Ed Loper. This claim was later filed. This lawyer sent Dr. Seale to her home. He examined Ed Loper and ordered him back to the Galveston hospital at once. This is all of the evidence as to how plaintiffs' counsel came to be in the case.

There is no evidence concerning the nature of the practice of plaintiffs' counsel, or showing that plaintiffs' counsel represented other claimants of compensation under the Workmen's Compensation law.

The only part of the record which shows any communication between Sandy Brooks and the plaintiffs' counsel before Sandy Brooks testified is the following statement by one of plaintiffs' counsel in the first argument made to the jury: "So, we went to Sandy Brooks, the trimmer, and Sandy Brooks was there and was willing to talk, and Sandy came here and told us his own version of it." There is no evidence that plaintiffs' counsel suggested to Sandy Brooks any testimony which he later gave or that plaintiffs' counsel or anybody else selected him to give testimony.

It is in proof that the Galveston physician, who operated on Ed Loper and participated in the autopsy, and who testified in the plaintiffs' behalf, changed his opinion regarding the effect which the blow claimed by plaintiffs to have been inflicted on Ed Loper had on Ed Loper's ulcer and that he did this after some communications between him and one of plaintiffs' counsel. This witness brought with him a file of papers concerning Ed Loper, and during his examination by one of defendant's counsel handed this file to this lawyer. Papers in this file seem to have disclosed to this lawyer the witness' change of opinion. Arguments by two of defendant's counsel greatly stressed this change of opinion and matters connected with it, and for this reason we have thought it necessary to state fully the relevant evidence.

This physician testified that a letter dated February 13th, which was addressed to another person but which came into his hands was the first information he had of it being claimed that Ed Loper was involved in an accident. Later, he talked with one of plaintiffs' counsel over the telephone and still later, had received a letter, dated February 20th, from this lawyer. He said that this lawyer had furnished him with statements by Sandy Brooks, Dr. Seale, and Ed Loper, but it was not shown when this was done. The witness testified:

"Q. And in that letter of February 20th you were told that these lawyers had a financial interest in the outcome of this case, weren't you? A. Yes, sir.

"Q. And they told you in that letter— rather, they wrote you again—Let's see the letter of February 20th you were talking about. A. There it is.

"Q. After writing you on February 20th, then they told you in a letter dated February 22nd, 1952, after telling you they had a financial interest in it, they told you: that we do not know whether the facts make out a case in behalf of Ed Loper's widow or not; she has no case unless in the honest opinion of reputable physicians there is a reasonable probability· that the accidental injury that Loper described was the producing cause of his death; isn't that right? A. That is what he wrote in the letter.

"Q. And he underscored in that letter part of that statement to emphasize it to you, didn't he? A. Yes, sir.

"Q. That she had no case unless you could so testify for her? A. Yes, sir.

"Q. In a case in which he had a financial interest; isn't that right? A. Yes, sir.

"Q. Then he tells you: 'From the whole of your report I am unable to determine what your opinion is with reference to the controlling issue.' That is a letter you wrote him—that you wrote to Mrs. Barnes —I mean he wrote you in response to a letter from you? A. That is right.

"Q. 'It is not sufficient that the accidental injury could possibly have caused the perforation of his duodenal ulcer, but to make out a case the court must find that in reasonable probability the accidental injury * * *' and he underscores the words * * * '* * * was the producing cause of his death', is that correct? ·A. That is right.

"Q. You had first wrote him and told him that under the state of facts he related to you that you had learned for the first time that it was possible that might have happened, didn't you? A. I said it was possible.

"Q. In response to your letter that it was possible, he told you that they couldn't make out a case unless you could furthermore say that it was reasonably probable, isn't that correct? A. That is right.

"Q. And after that, after getting that second letter from him, you then told him you could come here and testify in the case in which he had a financial interest, that his death from the facts he related to you was reasonably probably the result of the accident he described; isn't that right? A. Yes.

"Q. But you never did hear anything about such an accident until Mr. Barnes talked with you about three weeks ago, did you? A. No, I didn't."

This summary is all of the evidence concerning the Galveston physician's change of opinion. No other correspondence was proved and no explanation for the witness' change of opinion was made.

The transcript of the Galveston physician's testimony does show, however, that the witness answered defendant's counsel frankly and fully regarding all matters about which he was interrogated, and so far as we can tell from this record he did not hesitate to provide defendant's counsel with the information which showed that he had changed his opinion.

There is no evidence that this witness had received any money or that he was to receive any money. There is no evidence that the witness was guilty of any dishonesty in changing his opinion and so far as this record shows he may have changed his opinion because he thought the facts required this.

The arguments of plaintiffs' counsel, opening and in conclusion, and two of the three arguments by defendant's counsel have been completely reported. The material points of error are directed at the final argument made in behalf of the defendant. The parts of this argument which are material are quoted immediately below and the most important have been underlined. In parenthesis we have shown how the jury could have been expected to apply these statements. They could not have understood these statements otherwise because if plaintiffs' counsel were not meant the statements were meaningless.

"This is the last place that a party—you, I or anyone else—can go for protection against the onslaught of claims made by others. When the time comes that a person's belongings, his possessions, are not safe in your hands, we might as well give it all to Sandy Brooks, Cora Loper, Dr. Rowe *and the lawyers who are behind the scene in this case*. Mr. Barnes told you one thing of which I am in accord. He told you that you owe no favoritism in this case. I agree with that, and I ask you not to show any favoritism in this case. *Men (plaintiffs' counsel) whose business it is to file claims for people, regardless of whether they had an accident or not, don't really mean that when they say it*. They want you to show favoritism; and I will prove it to you by the closing argument which will be made by Mr. Faver (one of plaintiffs' counsel) in this case. *Men (plaintiffs' counsel) who are experienced in filing claims against insurance companies try those cases on two things and two things alone, regardless of the facts. They try them on prejudice against an insurance company and try it on the sympathy for an individual.* If you don't hear Glenn Faver (one of plaintiffs' counsel) say these words a dozen times in his closing argument I will be sadly mistaken: insurance company—this insurance company—this corporation—this insurance company. You will hear that. You will hear that. That is not all you will hear. That is to incite in the minds of you twelve men prejudice against a company which is writing protection for working men on their jobs who are hurt. That is the prejudice angle of it that he will work on. Then you will see him go down like this, and come up like this; and he will walk over there and go down like this, and come up like this, and as he does, saying these words: this poor humble unfortunate Negro woman and her little boy—her little boy. Now, watch for that. I say, Clyde (one of plaintiffs' counsel), you misrepresented the facts when you told the jury you didn't want any favoritism, because that is what you are after. Yes, sir: this poor humble old Negro woman, this old darkie —this old darkie and her little boy. Now, watch for that. This is where he wants his sympathy. He can't try this case any other way, because the facts are not in it."

"Now, if you don't find an accidental injury, the suit goes out the window. And that is what *they* (plaintiffs' counsel) told their friend Dr. Rowe (the Galveston physician)—if you don't find an accidental injury produced his death we are out of Court. That is what *they* told the good Doctor from Galveston. Now, remember, the important words—two of them—this case are these: accidental injury—accidental injury. All right; that is this case; those two words and those two words alone. Now, where is your witness in this case of accidental injury? Sandy Brooks sits out there now showing his interest in this case, remaining from the first day to the last. For thirty years he knew the Colemans and Lopers; kinfolks to Cora; rode back and forth with Ed Loper every day. *There is your case.* And Sandy Brooks—they have got to prove an accidental injury and *they* (plaintiffs' counsel—the "they" preceding) *pick out Sandy Brooks to do it with. Now, do you believe Sandy Brooks, or do you believe the power of suggestion overcome him too, like it did the good Doctor from Galveston?* (The following statements within parenthesis are the subject matter of Point 3) (*Don't you think an ignorant working Negro would be subject to the power of suggestion by some experienced insurance claimers?* (Plaintiffs' counsel) *Don't you think so? Don't you think this is about what happened; some Lawyer* (Plaintiffs' counsel) *with experience and ability in this sort of matter went to Sandy Brooks and says. "Sandy, you remember him getting hurt, don't you?" "Yes, sir, yes, sir; yes, sir; sure do." Just like that. Tells you all about it.) And why did they pick out Sandy Brooks? I am sure they would have rather had some one a little closerup there. Sandy was here at this end of the track. The negro was way down almost at the other—Loper was. Don't you suppose they would like to have had somebody a little closer? Well, they couldn't use Bodie Dean, the colored boy, could they? No; they couldn't use old Bodie.* Bodie was there some eight or ten feet away from Lo-

per. *The colored boy—his first wife was kin to Cora; he was kin to them; they couldn't use him.* No. Bodie Dean says he knows he didn't get hurt; he was looking right at him—"rat"—r-a-t—"rat" at him; no, sir; he didn't get hurt; he got sick out on the job—told him he got sick, had the stomach ache. *Why didn't they use Cooper?* He was the closest man to him—the sawyer; right there; and looking right at him. *You know why they didn't use Cooper. Because the lawyer's (plaintiffs') power of suggestion wouldn't work on Cooper, and you know it wouldn't. It didn't work on Cooper.* Went over there and got that *Negro Sandy Brooks—that was way down here.* Do you know what he says? He was facing Ed Loper. How did those men tell you he was facing? Ed Loper, the sawtailer, right here, was facing this conveyor, wasn't he—this track? This negro Sandy Brooks was facing north, they say, facing that way, the opposite direction. Everybody out there said that Loper was over there fifty or sixty feet to the left and west of Sandy Brooks, who was way over there. And Sandy Brooks came in here and told you fellows he was right there and he was standing right in front of him. That is what Brooks says. It is true, *as they* (plaintiffs' counsel) *told Dr. Rowe from Galveston, unless he would change his testimony and help us protect our financial interest in this case we haven't got a case.* That is true. *It is also true that unless Sandy Brooks, or somebody, would come here and swear from that witness stand that Loper received an accidental injury they wouldn't have a case—they wouldn't have a case.* Sandy Brooks, the man who said he wasn't related to them; the man who says Loper had worked the entire year just before, cutting pulpwood, just before he went and got him and brought him out to Bon Weir."

"Gentlemen of the jury, it is just not here. It is just not here. Whenever a group of lawyers (plaintiffs' counsel) can hear about somebody dying and can get a Negro to come in and swear on the last day on his job a slab touched him—if they can make out a case on that, in addition to over-reaching some young doctor, we might as well fold up and go home.

"* * * That will be enough. *We might as well fold up, throw in our marbles and give it to them, and join them; we haven't got a chance,* (The following statements within parenthesis are subject matter of Point 1.) *(Weren't you surprised at that young fellow? Weren't you surprised? A. fine looking young doctor, whose parents, no doubt, had spent their last dollar trying to make out of him an honorable man—and probably did so; then, for him to come in here and for a few paltry dollars, I presume* —[necessarily from plaintiffs' counsel, plaintiffs had no funds] *I don't know the amount of it—come in here and change from black to white merely because of a letter from a lawyer who was wearing a blue suit.) Weren't you surprised at the doctor? That doctor knows just as well as you do, and I do, that this was not an accidental injury case. He knew that.* And he told them over the telephone he had no such history. And apparently Clyde (one of plaintiffs' counsel) wrote him a set of facts —a set of facts, stating if this is true, or if that happened, what would be your opinion. Apparently, from those letters, he wrote back and said if those things are true, it is possible—it is possible that his death was caused by the injury. Oh, no; no, Doctor; can't use that; can't use that possible stuff; anything is possible; it is possible he might have died of a headache or toeache; the jury won't fall for that; the Court won't let that in; that is not the test; no. Clyde wrote him another letter and said, "*Doc, old boy, we got a financial interest in this thing; let's see if we can't get together; let's see if we can't understand each other; what you got to testify to is this: You got to come up there and swear that in your opinion it is reasonably probable that such an accident, assuming he had one, produced his death.*" (The following statement within parenthesis is subject matter of Point 2) *(Well, I don't know what else was in the conversation, or what took place, how much money changed hands* [necessarily plaintiffs' counsel] *or what it would cost to get the Doctor to do that. I don't*

*know.  It would take a lot for some doctors. It would take a lot for most of you to change from black to white.  But something happened.)  The Doctor said, "I will go along with you; I will go along with you; you have got a financial interest."  He come up here and on direct examination under Mr. Barnes he related that set of facts.*  Lo and behold, he had his file with him.  I will tell you one thing—you know, a Lawyer never gets too old to learn; he learns every day.  Sometimes he is caught by a juror; sometimes he is caught by the other lawyer; sometimes he is caught by the Court.  I bet you the next time the Doctor goes to court he will leave that file in Galveston."

Points 1 and 2 assign error to statements about the physician, and Point 3 assigns error to a statement about Sandy Brooks. The particular statements are identified in the quotations made from the argument. Point 6 assigns error to the entire argument.

Points 1, 2, 3 and 6 are sustained.  The substance of this argument is that plaintiffs' case was fabricated and that plaintiff's counsel were the ones who did the job; and this argument seems to be founded on the fact, and made largely by way of inference from the fact, that the Galveston physician changed his opinion after some communications from plaintiffs' counsel. Some of the statements underlined are in general or indefinite terms, but could only have been understood as applying to the plaintiffs' counsel, and plaintiffs' counsel were identified near the beginning of the argument as "the lawyers who are behind the scene in this way."  As our statement from the record shows there was no evidence that any of these charges were true. To limit our discussion to the most important, there is no evidence that plaintiffs' counsel "picked out" Sandy Brooks and suggested to him the testimony which he gave.  The charge that plaintiffs' counsel did this was made by way of inference from a charge that the plaintiffs' counsel had overcome the Galveston physician by their power of suggestion.  At the bottom of the latter charge was the fact that the Galves-

ton physician actually did change his opinion after communications from plaintiffs' counsel, but this fact does not support an inference that counsel did this by the power of suggestion nor does it support the much remoter inference that they suggested Sandy Brooks' testimony to him.  There is no evidence, as we have previously pointed out, that anybody paid the Galveston physician any money, and the Galveston physician's change of opinion does not support an inference that it invoked dishonesty or false testimony.  It is not improbable that the physician simply reconsidered the facts.  The defendant's counsel had the right to comment on the witnesses' testimony, to criticize the physician's change of opinion, and to draw inferences from the matters in proof; and much latitude in these matters has been allowed litigants.  It must be said, too, that the opening argument, made by one of plaintiffs' counsel, contains statements apt to provoke retaliatory replies by counsel for defendant.  We note, for instance, that plaintiffs' counsel who made the opening address heaped coals of fire on his own head, predicted that defendant's counsel would "indicate to you in their argument that the compensation idea is a way-after thought" and, himself, went out of the record in several directions (the record does not show that Dr. Seale is dead or that no witness except Sandy Brooks "was willing to talk") and, referring to the defendant's witnesses, mentioned "the similarity in the story of all of them."  The subject matter of Point 4 was a reply to statements made by plaintiffs' counsel in the opening argument.  However, the argument of the defendant's counsel which is under review exceeded all of these various limits.  It is a much harder and more precise argument than that considered by this Court in No. 4488, O. D. Jackson v. Traders & General Ins. Company (not printed) and is similar to an argument which is condemned in Airline Motor Coaches, Inc., v. Campbell, Tex.Civ.App., 184 S.W.2d 532 at page 534 (Hn. 2).  Concerning provocation and reply, see: Southwestern Greyhound Lines v. Dickson, 149 Tex. 599, 236 S.W.2d 115, at page 119.

■ The argument constituted error. Futhermore, it "probably influenced the verdict unfavorably to petitioner". Southwestern Greyhound Lines v. Dickson, 236 S.W.2d 115 at page 120 (Hn. 7, 8). The issue between the parties, whether Ed Loper was hit by a piece of timber, was very closely drawn. The plaintiffs' side of this issue depended wholly on the testimony of Sandy Brooks; this witness stood alone and was uncorroborated. The charge that the plaintiffs' counsel caused Sandy Brooks to testify as he did was given added force by the similar charges involving the Galveston physician, and all of these charges were heightened by other derogatory statements and by counsel's inferences from the facts concerning the Galveston physician's change of opinion. We do not know what the jury thought and must, therefore, speculate about the effect which the argument had upon the jury; but it seems to us that this argument, under the circumstances, was directly calculated to affect the jury's decision.

■ The final question concerning these points is raised by the fact that no objection whatever was made to the argument under review. Undoubtedly, the effect of some of the statements could have been obviated, and perhaps some could have been prevented, by an instruction from the trial court, and plaintiffs thus have contributed partly to the results of the argument. However, we are not satisfied that the effect of the statements made concerning the Galveston physician could have been obviated under the facts of this case. This witness' testimony bore mainly on the issue of causation, as distinguished from the issue of accidental injury, which is the issue now being considered; but the statements about the physician necessarily affected the credibility of Sandy Brooks. The jury must have believed that if plaintiffs' counsel had, through improper means, caused one witness to testify in their behalf, they probably caused others to do so. The reflections cast upon the conduct involving the Galveston physician reflected upon everything put forward in plaintiffs' behalf except such as was provided by defendant's own witnesses.

■ These comments require that the judgment be reversed. However, we have considered the other points of error and find nothing in them which requires reversal. The argument to which Point 4 assigns error was, as we have stated, a reply to comments made by the plaintiffs' counsel in his opening argument. The argument to which Point 5 assigns error may have told the jury the effect of their answer to Issue 1, but the information had already been given them in the cross-examination of the Galveston physician which we have quoted. The argument to which Points 7 and 8 assign error has some support in the record. It is apparent from the questions of defendant's counsel that the defendant did not bring Dr. Humphreys to Jasper. Plaintiffs, then, must have done so; and the Galveston physician who did testify, and who had accompanied Dr. Humphreys as far as Jasper, evidently at the plaintiffs' request, was of the opinion that Dr. Humphreys intended to testify. Nevertheless, Dr. Humphreys did not testify, and it was in evidence that he had observed the autopsy of Ed Loper. There was some basis for an argument that the plaintiffs' counsel decided not to call Dr. Humphreys to the stand. The other Points of Error present nothing of importance.

The judgment of the trial court is reversed and the cause is remanded.

### On Motion for Rehearing.

■ (1) Grounds 1, 2, 3 and 4 assign as error that plaintiffs' Points 1, 2, 3 and 6 (which we sustained) are not supported by Bills of Exception. The transcript of the arguments to which plaintiffs' Points of Error assign error is certified by counsel for the respective parties as being "a full, true and correct transcript" of these arguments, and this certificate concludes with the statement that "we agree that same (meaning the transcript) may be filed as and shall constitute the argument to the jury by counsel in this cause on appeal." The trial judge also certified the transcript and ordered it filed as a part of the record. In Smith v. United Gas Pipe Line Co., 149 Tex. 69, 228 S.W.2d 139, at page 143,

it is said that the proper way to preserve objections to improper argument is by Bill of Exceptions rather than by the court reporter's record as a part of, or supplement to, the statement of facts "unless counsel agree on the latter method." According to their certificate counsel did agree.

■ (2) Ground 5 is that the assignment on which Point 6 is based does not certify the grounds of complaint with such particularity, as the Rules require. This assignment is paragraph 1 of the plaintiffs' amended motion for new trial. It is in general terms, but if a party is to complain of a series of statements which work toward one end, he must either put his complaint in general terms or else must list every statement he objects to. The general terms are enough if the trial court is told thereby of the party's basic complaint, and it seems to us that assignment 1 of the plaintiffs' amended motion for new trial does that under the circumstances of this case.

■ (3) Ground 6 is that the arguments to which the plaintiff assigned error in Points 1, 2, 3 and 6 had, in effect, already been made during a previous address to the jury by another of defendant's counsel and that no objection was made to this earlier address. We agree that the two addresses contain some like statements. For instance, in the earlier address it was said that "this case—has been presented by the plaintiff—not by Ed Loper, but—I think you will agree with me and I wish not to be unfair with them—but by some lawyers who have a financial interest, according to their own declarations, in the outcome of this suit." A statement, or statements, of like import were made in the address to which Points 1, 2, 3 and 6 assign error. However, the later address goes beyond the limits reached by the earlier one. Thus in the earlier address, counsel referred to Dr. Rowe's change of opinion and to the statement made to him that plaintiffs' lawyers had a financial interest in the case, said that plaintiffs' counsel had caused Dr. Rowe to change his opinion, and in effect,

if not in words, said that Dr. Rowe's testimony ought not to be believed. However, it was nowhere stated in the earlier address, as it was, in substance, in the later address, that Dr. Rowe was paid some money to change his opinion.

(4) Other grounds of the motion for rehearing have been discussed together by the defendant and we will do the same. We agree with defendant that there is evidence that the plaintiffs' counsel did cause Dr. Rowe to change his opinion and we agree that the defendant's counsel had the right to discuss these matters in their argument. We did not mean to say otherwise in our opinion. Words such as "power of suggestion" might exceed the limits of rightful argument concerning these matters but if so, the excess could have been cured by objection on behalf of the plaintiffs and instruction by the court. However, we remain of the opinion that there is no evidence that plaintiffs' counsel accomplished this change of opinion by Dr. Rowe in an improper way or that anybody was dishonest. The reference made in the letter of February 20th (about which Dr. Rowe was questioned by defendant's counsel) to a financial interest which the plaintiffs' lawyers had in the outcome of the case does not support an inference that counsel were willing to pay Dr. Rowe for favorable testimony or that they did so. As regards the statements made about Sandy Brooks, to which error was assigned in Point 3, we are of the opinion that the harmful effect of these statements could have been obviated by an objection by the plaintiffs and an instruction by the court if these statements could be considered alone and without reference to the context of the argument in which these statements were made.

But such a separation cannot be made; the various statements to which Points 1, 2, 3 and 6 assign error were all really tied together, and at the bottom of the attack made on the plaintiffs' case are the statements about Dr. Rowe. Thus immediately before the statement attacked by Point 3 appears the statement: "Now, do you believe Sandy Brooks, or do you believe the

366

power of suggestion overcame him too, like it did the good Doctor from Galveston?" The conduct charged in these statements necessarily reflected on the witness Sandy Brooks, on whose testimony the plaintiffs depended to show that Ed Loper sustained an injury while at work. See: Scoggins v. Curtiss & Taylor, Tex.Civ.App., 219 S.W.2d 451 at page 453 where the Supreme Court discusses the effect of improper statements by a juror which are analogous to the statements about Dr. Rowe. And the argument defendant makes in support of these grounds of the motion for rehearing shows that this result was intended. See pages 8 and 9 of "Appellee's Argument in Support of its Motion for Rehearing."

It seems to us that the main question raised by the motion is that raised by the appeal, namely, whether arguments to which the plaintiffs assign error were such that objection and instruction would have removed the harmful effect which these arguments might have had. We adhere to our original judgment.

The motion for rehearing is overruled.
Per Curiam.

On Second Motion for Rehearing.

(1) The argument objected to contains these statements:

(a) "Weren't you surprised at that young fellow? Weren't you surprised? A fine looking young doctor, whose parents, no doubt, had spent their last dollar trying to make out of him an honorable man—and possibly did so; then, for him to come in here and for a few paltry dollars, I presume—I don't know the amount of it—come in here and change from black to white merely because of a letter from a lawyer who was wearing a blue suit. Weren't you surprised at the doctor? That doctor knows just as well as you do and I do that this was not an accidental injury case. He knows that." (b) "Clyde wrote him another letter and said: 'Doc, old boy, we got a financial interest in this thing; let's see if we can't get together; let's see if we can't understand each other; what you got to testify to is this; you got to come up there and swear that in your opinion

it is reasonably probable that such an accident, assuming he had one, produced his death.' Well, I don't know what else was in the conversation, or what took place, how much money changed hands or what it did cost to get the doctor to do that. I don't know. It would take a lot for some doctors. It would take a lot for most of you to change from black to white. But something happened. The doctor said, 'I will go along with you; I will go along with you; you have got a financial interest.' He came up here and on direct examination under Mr. Barnes he related that set of facts."

It seems to us that these statements, considered alone but certainly when considered with the rest of the argument objected to, directly charge that Dr. Rowe, to whom these statements referred, was paid money to change his opinion, and that he did so for that reason. We are unable to agree with defendant that these statements mean no more than that Dr. Rowe received the customary payment made to an expert witness as compensation for time spent away from his business or profession. Since the evidence showed that the plaintiffs had no money the jury must have understood that plaintiffs' counsel, elsewhere said to be the persons behind the scenes, were the ones who paid Dr. Rowe.

(2) The statements just quoted are not like those considered in Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054, which defendant cites. The statements complained of in the latter case were generalized abuse; that which we have quoted above are more definite and explicit. See the statements in Scoggins v. Curtiss & Taylor, Tex.Civ.App., 219 S.W.2d 451 at page 453 and in Southwestern Greyhound Lines v. Dickson, 149 Tex. 599, 236 S.W.2d 115.

(3) In Aultman v. Dallas Ry. & Terminal Co., Tex.Sup., 260 S.W.2d 596, 600, which defendant cites, the court, at page 600, gave some weight to the fact that the argument objected to could only have influenced the decision of a particular issue. However, the holding is not in point on the facts. Of the two doctors mentioned in the opinion in Aultman's case, Dr. Jackson was accused of acting

upon a reason wholly personal to her and Dr. Loiselle did not testify; and neither of these physicians nor either party was charged with the conduct charged in the statements quoted above concerning Dr. Rowe. Our holding that the statements made concerning Dr. Rowe also reflected upon the credibility of Sandy Brooks was based upon reasons which were not present in the Aultman case.

(4) We note the following statement in the opinion in the Aultman case: "In the light of the whole record we cannot say that there is more reason than not to believe that the jury's verdict for the petitioners was caused by the possible inference, to be drawn from the argument that if Dr. Loiselle were present he would support Dr. Jackson's testimony." The issue suggested by this language is certainly in this case, but we think the circumstances in behalf of the plaintiff in the case at bar are stronger than those in behalf of the defendant in the Aultman case. Only Sandy Brooks testified for plaintiff under Issue 1, and we see no such preponderance of testimony in defendant's favor as might affect our decision. See Rogers. v. Broughton, Tex.Civ.App., 250 S.W.2d 606.

The second motion for rehearing is overruled.