Benny P. PHILLIPS, M.D., Appellant,

v.

Dale BRAMLETT, Individually, and as Independent Administrator of the Estate of Vicki Bramlett, Deceased; Shane Fuller and Michael Fuller, Appellees.

No. 07–05–0456–CV.

Court of Appeals of Texas, Amarillo.

March 19, 2007.

Jim Hund, Hund & Harriger L.L.P., Lubbock, for Appellant.

Alexander B. Klein III, J. Todd Trombley, The Klein Law Firm, Houston, Thomas J. Turner, Turner & Jordan, P.C., Lubbock, John Smithee, Templeton Smithee Hayes Heinrich & Russell, L.L.P., Amarillo, for Appellees.

Before CAMPBELL and HANCOCK, JJ., and REAVIS, S.J.[1]

## OPINION

MACKEY K. HANCOCK, Justice.

Appellant, Benny P. Phillips, M.D., appeals from a jury verdict and subsequent judgment in favor of appellees, Dale Bramlett, individually and as independent administrator of the estate of Vicki Bramlett, Shane Fuller, and Michael Fuller (collectively, "Bramlett"), in their medical malpractice action. Phillips presents six issues contesting the judgment: 1) the evidence was legally or factually insufficient to support a judgment that Phillips proximately caused the death of Vicki Bramlett, 2) Bramlett's jury argument was improper and harmed Phillips, 3) the trial court failed to properly apply the statutory cap on damages in a medical malpractice action, *see* TEX.REV.CIV. STAT. ANN. art. 4590i, § 11.02(a) (Vernon Supp.2001),[2] 4) the evidence was legally or factually insufficient to support a finding of gross negligence, 5) the evidence was factually insufficient to support certain of the damages awarded by the jury, and 6) the award of punitive damages exceeds the limits set by TEX. CIV. PRAC. & REM.CODE ANN. § 41.008 (Vernon Supp.2006).

### Factual Background

Phillips is a gynecologic oncologist who performed a laproscopic-assisted vaginal hysterectomy on Vicki Bramlett, on October 29, 2002. The procedure appeared to have been successful and Vicki was re-

---

1. Don H. Reavis, Justice (Ret.), seventh Court of Appeals, sitting by assignment.

2. Act of June 16, 1977, 65th Leg., R.S., ch. 817, § 11.02, 1977 Tex. Gen. Laws 2039, 2052. Article 4590i was repealed by Act of June 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. As Bramlett's medical malpractice suit was filed on May 27, 2003, prior to the repeal of article 4590i, we must apply the provisions of that article. Further reference to specific provisions of TEX.REV.CIV. STAT. ANN. art. 4590i will be by reference to "art. 4590i, § ___."

turned to her hospital room. At approximately 5:30 p.m., Phillips was notified that Vicki, although otherwise stable, had produced only 50 cc of urine. A low urine output symptom could indicate internal bleeding or dehydration. Phillips ordered that Vicki's blood be tested for hemoglobin and hematocrit levels (H & H test) "stat" (immediately) and that she be given 500 cc of I.V. fluids over a 30 to 60 minute period (fluid challenge). The results of these tests were to be called in to his office. While the tests were being performed and read, Phillips assisted another physician in surgical procedures at the same hospital.

While Phillips was assisting in these surgeries, the results of Vicki's tests were given to his office, who relayed them to the voice mail on Phillips's cell phone. The test results revealed that Vicki's hemoglobin had dropped from a preoperative level of 15.7 to 9.8 and that her urine output had not changed. Following the completion of the last surgery, Phillips left the hospital without retrieving the voice mail from his cell phone, checking on Vicki's status, or otherwise determining the results of the ordered tests. Phillips proceeded to a previously scheduled cardiac workout with a trainer at a local gym. Upon arriving at the gym, Phillips received an urgent message that Vicki's condition had deteriorated and had become critical. Phillips rushed back to the hospital and ordered that Vicki be taken to the operating room. During surgery, Phillips discovered a massive amount of blood in Vicki's lower abdomen and pelvis. Despite attempts at resuscitation, Vicki suffered aspiration pneumonia, brain damage, and organ failure. Four days later, on November 2, 2002, Vicki died from complications due to postoperative bleeding.

## Procedural Background

Dale Bramlett and Vicki's two sons, Shane and Michael Fuller, filed suit for wrongful death against Phillips and Covenant Hospital. Prior to trial, Covenant settled Bramlett's claims for $2,300,000 and was dismissed from the case. The remaining action against Phillips went to trial and the jury returned a verdict in favor of Bramlett. The jury's verdict included a finding that Phillips had been grossly negligent. Further, the jury was required to proportion the negligence between Phillips and Covenant and the jury assessed Phillips 75 percent responsible for Vicki's death. The jury then awarded Bramlett $11,000,000 in actual damages and $3,000,000 in punitive damages. Phillips filed a motion to disregard certain jury findings and a motion for judgment notwithstanding the verdict. The trial court overruled each of these motions. Judgment was subsequently entered awarding Bramlett $9,196,364.50 in actual damages and $2,972,000 in punitive damages.[3] Following the court's entry of judgment, Phillips filed a Motion to Correct, Modify or Reform Judgment and a Motion for New Trial. The trial court overruled each postjudgment motion and Phillips filed notice of appeal.

By six issues, Phillips challenges the legal and factual sufficiency of the evidence to support the jury's finding on the issue of causation, whether the jury argument made by Bramlett's attorney was improper, the refusal of the trial court to apply the statutory damage caps to the judgment, the sufficiency of the evidence to support the jury's finding that Phillips was grossly negligent, the factual sufficiency of the evidence to support the jury's

---

**3.** These amounts do not equal 75 percent of the jury's findings but rather the calculation of damages after deductions for settlement credit plus prejudgment interest less deduction for settlement offer. The total calculations are not contested by either party.

award of damages, and whether the punitive damages award exceeded the limits set by TEX. CIV. PRAC. & REM.CODE ANN. § 41.008 (Vernon Supp.2006). We will affirm in part, suggest a remittitur in part, and reverse and render in part.

## Legal and Factual Sufficiency of the Evidence Regarding Proximate Cause

■ Phillips initially contends that the evidence was not legally or factually sufficient to support the jury's finding that his negligence proximately caused the death of Vicki. When both the legal and factual sufficiency of the evidence are challenged, we will first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981).

■ When addressing legal sufficiency, the reviewing court must ultimately determine whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The scope of the review requires consideration of all of the evidence, giving deference to evidence favorable to the verdict if reasonable and fair-minded jurors could and disregarding evidence contrary or unfavorable to the verdict unless reasonable and fair-minded jurors could not. *Id.* Phillips's primary contention concerns the proof of proximate cause.

■ As this is a medical malpractice case, Bramlett had to prove that the negligence of Phillips proximately caused the death of Vicki within a reasonable medical probability. *See Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex.1988). Proximate cause is made up of both cause in fact and foreseeability. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex.2005). Specifically, it is as to the cause in fact element that Phillips posits the evidence is legally insufficient. Phillips correctly points out that

cause in fact requires that Bramlett prove that the negligence of Phillips was a substantial factor in bringing about Vicki's death and without such negligence Vicki would have survived. *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995). Phillips's ultimate contention is that the evidence of cause in fact was nothing more than the bare opinion of the expert without an identification of the causal connection and is, therefore, no evidence of cause in fact. *Archer v. Warren*, 118 S.W.3d 779, 782 (Tex.App.-Amarillo 2003, no pet.). In order to properly analyze Phillips's contention, a more detailed review of the procedural setting and evidence adduced at trial is required.

Bramlett proceeded to trial on the basis of their Fourth Amended Petition, which provided, in pertinent part, that Phillips was guilty of negligence by: 1) failing to provide appropriate and proper care; 2) failing to adequately assess Vicki's medical condition; and 3) failing to provide treatment in accordance with the applicable standard of care. To prove Phillips's negligence and that it proximately caused Vicki's death, Bramlett offered the testimony of David Hemsell, M.D., as an expert in the medical specialty of obstetrics and gynecology.

Dr. Hemsell opined that Phillips's ordering of the H & H test (stat) was appropriate, especially where Phillips was concerned that Vicki might be suffering internal bleeding post-operatively. Where the expert faulted Phillips was in not following up on the test. Dr. Hemsell testified that the responsibility to determine the cause of Vicki's low urine output and whether it was due to post-operative bleeding was the treating physician's. Further, Dr. Hemsell testified that the nurses could not give more fluids or blood to Vicki or take her back for further surgery without orders to do so from the

treating physician. It was Dr. Hemsell's expert opinion that Phillips was negligent in not checking his voice mail before leaving the hospital, inquiring into the results of the tests he had previously ordered for a possible medical condition that he was professionally concerned about, or going to the patient's room and confirming the clinical status of the patient. Dr. Hemsell further testified that he had never heard of nor read about a patient bleeding to death after a laproscopic-assisted vaginal hysterectomy. Additionally, Dr. Hemsell testified that had Phillips gone to the bedside of Vicki after finishing his last surgery, Vicki would probably be alive today.

In addition to the testimony of Dr. Hemsell, Phillips's expert, Dr. Diana Contreras, testified that Vicki's death was due to negligence. Further, Dr. Contreras testified that had Phillips gone to Vicki's bedside and given her the care and treatment that she needed, she would be alive today. Finally, Dr. Contreras agreed that Phillips was the only person who could have ordered additional I.V. fluids or a blood transfusion or to have Vicki taken back to surgery.

Phillips's partner, Dr. William Edward Richards, testified, as a treating expert, that when he first observed Vicki, at 7:45 p.m. on the day of surgery, she was suffering from hypovolemic shock. Dr. Richards testified that the hypovolemic shock appeared to be the result of the patient bleeding most of her blood out of her veins and into her abdomen or pelvic area. Dr. Richards also testified that, considering the facts known to Phillips and the pending H & H test and fluid challenge, Phillips should have checked his voice mail before leaving the hospital. Dr. Richards testified that a reasonably prudent physician in Phillips's position would have checked his voice mail prior to leaving the hospital.

Phillips testified that one of his concerns when he ordered the H & H test was the possibility that Vicki was suffering from post-operative bleeding. Phillips admitted that his office had phoned the results of the H & H test to his cell phone's voice mail while he was assisting in his last surgery of the day. He further admitted that he never checked his voice mail prior to leaving the hospital. In at least two places in the trial court record, Phillips affirmatively responded to a question from counsel that "[i]f [he] would have checked [his] voice mail, [he] would have stayed at the hospital...." Phillips also admitted that, had he gone to Vicki's room to check on her clinical condition after finishing his last surgery, she would probably be alive today. Phillips testified that a reasonable and prudent doctor would have gone to check on Vicki if he had any knowledge that her clinical condition had deteriorated, but Phillips denied having received the H & H test results prior to his arrival at the gym. Throughout the trial, Phillips contended that the reason Vicki died was because the nurses at the hospital did not keep him properly apprised of her clinical condition.

However, the emergency steps taken by Phillips when he returned to the hospital were, in total, almost the same as outlined by Bramlett's expert as steps that the nurses could not have taken without the orders of a physician. In the absence of the physician, these steps could not be taken.

In reviewing the total record, we note that much of the testimony relied upon by Bramlett to support their position that the evidence was legally sufficient came by way of cross-examination of the various witnesses. In nearly all of these situations, the witnesses were impeached with prior deposition testimony. Thus, the jury's ultimate resolution of the apparently

conflicting testimony resulted in a factual finding adverse to Phillips.

Phillips's legal sufficiency challenge is grounded upon his perception that the evidence presented by Dr. Hemsell was, at best, conclusory on the issue of cause in fact. The cases cited by Phillips point out that Bramlett was required to offer competent expert testimony[4] that proved:

1) the standard of care that Phillips should have used in his post-operative treatment of Vicki;

2) what action of Phillips breached that standard of care;

3) the injury suffered by Vicki; and

4) a causal connection between the breach of the standard of care and the injury suffered.

*See Moreno v. M.V.,* 169 S.W.3d 416, 420 (Tex.App.-El Paso 2005, no pet.); *Blan v. Ali,* 7 S.W.3d 741, 744 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

The testimony of Dr. Hemsell, as previously outlined, demonstrated that he thought Phillips's ordering of the H & H test was appropriate for a post-operative patient who was demonstrating low urine output. However, Dr. Hemsell opined that Phillips breached the standard of care when he did not follow up on the H & H test, especially when he was concerned that the patient might be suffering from post-operative bleeding. Specifically, the lack of any action by Phillips to determine the results of the test, in order to confirm or contradict that the patient was suffering from post-operative bleeding, was a breach of the standard of care. In discussing the breach of the standard of care, Dr. Hemsell was adamant that Phillips should not have left the hospital without checking his voice mail, especially as the cell phone was one of the ways Phillips had ordered his staff to communicate with him. In lieu of checking his voice mail, Dr. Hemsell stated that Phillips should have either contacted the hospital directly about the test results or gone by the patient's room to determine her then-existing clinical condition. The injury suffered by Vicki, as a result of Phillips's inaction, was that she lapsed into hypovolemic shock due to loss of blood and subsequently died. Dr. Hemsell testified that he had never heard of or read about a patient who had bled to death following a laproscopic-assisted vaginal hysterectomy. Dr. Hemsell concluded that only the physician, Phillips, could order additional fluids, blood transfusion, or further surgery. Accordingly, it was Dr. Hemsell's opinion that the failure to accurately maintain awareness of the clinical condition of the patient was negligence on the part of Phillips and that this negligence was the proximate cause of Vicki suffering hypovolemic shock which resulted in her death.

■ Additionally, other experts testified during the trial regarding the standard of care, breach, injury, and causation. Both Dr. Contreras and Dr. Richards initially testified in a manner that supported Phillips's primary defensive theory, that the negligence of the nurses at the hospital was the primary cause of the injury suffered by Vicki. However, during cross-examination, both testified that, had Phillips gone to the bedside of Vicki before leaving the hospital and given her the treatment required, she would be alive today. When asked about who could order the necessary treatment for Vicki, Dr. Contreras testified that only the doctor could order additional I.V. fluids, blood transfusion, or order that the patient be taken back for a subsequent surgery. Dr. Richards testified that, when he observed Vicki at 7:45, she was suffering from hypovolemic shock and that she had, in fact,

---

**4.** Dr. Hemsell's qualifications and expertise were never challenged by Phillips.

bled most of her blood out of her veins and into her abdomen or pelvic areas. The testimony of these witnesses was equally available to the trier of fact in determining the ultimate issue of whose negligence proximately caused the death of Vicki. In a multiple expert case, such as this one, each expert's testimony on the possible causes of death is appropriate to assist the jury in reaching its ultimate decision. *Hooper v. Chittaluru,* 222 S.W.3d 103, 113 (Tex.App.-Houston [14th Dist.] 2006, pet. filed) (op. on reh'g.). In conducting our legal sufficiency review, we also must consider this testimony. *City of Keller,* 168 S.W.3d at 827.

Finally, the testimony of Phillips must be considered. During cross-examination, Phillips admitted that, had he gone to the bedside of Vicki and evaluated her clinical condition, she would be alive today. Further, he admitted that, had he checked his voice mail, he would have stayed at the hospital. Bramlett posits that this testimony amounts to judicial admissions and, therefore, conclusively proves Phillips's negligence. Phillips's admissions are quasi-admissions, which are not conclusive. *Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.,* 606 S.W.2d 692, 694 (Tex. 1980). However, a quasi-admission will be treated as a judicial admission if it appears that:

1) the declaration relied upon was made during the course of a judicial proceeding;

2) the statement is contrary to an essential fact embraced in the theory of recovery or defense asserted by the party giving the testimony;

3) the statement is deliberate, clear, and unequivocal, thereby, eliminating the hypothesis of mere mistake or slip of the tongue;

4) giving conclusive effect to the declaration will be consistent with the pub-

lic policy upon which the rule is based; and

5) the statement is not destructive of the opposing party's theory of recovery.

*Griffin v. Superior Ins. Co.,* 161 Tex. 195, 338 S.W.2d 415, 419 (1960).

Considering Phillips's admissions in light of these factors, there can be no question that the testimony of Phillips was made during a judicial proceeding. It is further beyond question that Phillips's position was that he committed no act of negligence in the treatment of Vicki, rather that it was the hospital's nurses that acted negligently. Accordingly, Phillips's admissions that, had he checked his voice mail, he would have stayed at the hospital and Vicki would be alive today, runs contrary to an essential fact of Phillips's defensive theory. Phillips made these admissions on two separate occasions during cross-examination, thereby, eliminating the slip of the tongue or mistake hypothesis. Giving conclusive effect to these declarations is consistent with the public policy that it would be unjust to allow a party to rely on one factual defense at trial and then, after the trier of fact found against him, to argue a different factual defense on appeal. Finally, there is nothing about these quasi-admissions that is destructive of Bramlett's position. We, therefore, conclude that the quasi-admissions of Phillips should be treated as judicial admissions on the question of negligence and cause in fact of the death of Vicki. *Id.*

When this testimony is reviewed to determine whether reasonable and fair-minded jurors could find that Phillips's negligence was the proximate cause of Vicki's death, we are convinced that the evidence was legally sufficient to sustain the jury's verdict. *City of Keller,* 168 S.W.3d at 827. Having concluded that the evidence was

legally sufficient to support the verdict, we must next turn our attention to the issue of the factual sufficiency of the evidence.

■ In reviewing a factual sufficiency challenge, we must again review all of the evidence. *See Lofton v. Tex. Brine Corp.*, 720 S.W.2d 804, 805 (Tex.1986). However, in a factual sufficiency review, deference is not given to evidence favorable to the verdict and contrary evidence is not disregarded. Rather, we will reverse a verdict on the basis of factual insufficiency only if the verdict is so against the great weight and preponderance of the evidence that it is manifestly erroneous or unjust. *See In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Having heretofore reviewed all of the evidence for purposes of the legal sufficiency challenge, we note that the evidence that is contrary to the jury verdict centered on the activity of the hospital nurses, specifically whether the nurses failed to keep Phillips properly apprised of Vicki's clinical condition. The record reflects that all experts, including Phillips, testified that, if Phillips had followed up on the test results, Vicki would have lived. None of these experts indicated that the nurses unduly delayed reporting the test results. There was some conflicting testimony about the recording of Vicki's vital signs and whether the hospital staff took the vital signs as ordered. However, the trier of fact heard this evidence and resolved the conflict when they apportioned responsibility 75 percent to Phillips and 25 percent to the hospital. After reviewing all of the evidence, we cannot say that the jury's finding was so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Id.* Therefore, we find the evidence factually sufficient to sustain the jury's verdict. Having determined that the evidence was

legally and factually sufficient, we overrule Phillips's first issue.

### Improper Jury Argument

■ Phillips next contends that Bramlett made an improper jury argument that resulted in harm to Phillips and that requires reversal. Phillips posits that Bramlett's argument that the jury needed to send a message to the doctors of Lubbock County by awarding a substantial sum of money in damages was improper and reversible. In analyzing an allegation of improper jury argument we begin by noting that, to obtain a reversal based upon alleged improper jury argument, Phillips must prove the existence of:

1) improper argument;

2) that was not invited or provoked;

3) that was preserved by the proper trial predicate; and

4) if no objection made or if objection made and sustained, that was incurable; or

5) if timely and proper objection overruled by trial court, that was by its nature, degree, and extent harmful reversible error.

*Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex.1979); *Melendez v. Exxon Corp.*, 998 S.W.2d 266, 280 (Tex. App.-Houston [14th Dist.] 1999, no pet.). *See generally* 4 Roy W. McDonald, et al., *Texas Civil Practice* § 23:23–24 (2nd ed.2001).

For the purpose of discussing the contentions of Phillips, we will assume, without deciding, that the argument complained of was improper. There is nothing to suggest that the argument in question was invited or provoked. Rather, Phillips contends that the error was preserved at trial and, if not, was an incurable jury argument that was preserved by his motion for new trial. In addressing the issue

of preservation of error, we note that the first instance of the alleged improper argument occurred very early in the opening of Bramlett's final argument. Counsel stated, "For years, in this very conservative community, juries have been very liberal with the doctors, very liberal. What I mean is: Their verdicts didn't send much of a message at all." Immediately, Phillips's counsel voiced the following objection, "Judge, I object to any testimony about the propriety of other trials and the verdicts reached by other juries in Lubbock." To which, the trial court responded, "This is his argument, and it is not testimony." Subsequently, Bramlett's counsel repeatedly argued that the jury needed to send a message to the doctors of Lubbock. However, on none of these occasions did Phillips object. It is from this record that we must determine whether or not Phillips has preserved error. Texas Rule of Appellate Procedure 33.1(a)(1)(A) requires, to preserve an allegation of error for appellate review, the record must show a timely objection stating the grounds for the requested ruling with enough specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context. TEX. R.APP. P. 33.1(a)(1)(A). From the language used in the objection and the response of the trial court, it is apparent that the trial court did not perceive the objection to be directed toward improper jury argument. Rather, the record reflects that the trial court simply clarified that the statement was not evidentiary. Nor can we say that the context of the objection makes the specific grounds now complained of clear. *Id.* Additionally, the trial court never sustained or overruled the objection. To preserve a complaint for appeal, the complaining party is required to obtain an adverse ruling from the court or object to the trial court's refusal to rule. TEX.R.APP. P 33.1(a)(2); *See Cherry v. Lee,*

899 S.W.2d 329, 331 (Tex.App.Houston [14th Dist.] 1995, no writ). We have, therefore, determined that the error alleged was not preserved at trial pursuant to the Texas Rules of Appellate Procedure. *See* TEX.R.APP. P. 33.1(a).

However, this does not end our inquiry. In his motion for new trial, Phillips alleged that Bramlett's jury argument was incurable. As a result, we must determine whether this jury argument was incurable and, therefore, was preserved by Phillips raising the issue in his motion for new trial. TEX.R. CIV. P. 324(b)(5); *Otis Elevator Co. v. Wood,* 436 S.W.2d 324, 333 (Tex.1968). Initially, we note that it is a rarity for jury argument to be so inflammatory or prejudicial as to be classified as "incurable." *Standard Fire Ins. Co.,* 584 S.W.2d at 839. To properly determine whether a complained of jury argument is incurable, we must review the entire case from voir dire to the conclusion of final argument. *Id.* at 840. Ultimately, we are attempting to determine whether the probability that the improper jury argument caused harm is greater than the probability that the verdict was grounded on proper proceedings and evidence. *Id.* The type of argument that reaches this level is one that is so inflammatory that its harmful nature cannot be cured by an instruction to disregard. *Melendez,* 998 S.W.2d at 280. After reviewing the various authorities cited by Phillips, it is apparent that cases reversing judgments for incurable jury argument fall into the category of arguments that resort to name calling, epithets, racial slurs, and attacks upon opposing counsel of a personal and extreme nature. *See S. Pac. Co. v. Hubbard,* 156 Tex. 525, 297 S.W.2d 120, 125 (1956) (plaintiff's attorney argued that the railroad accused anyone who sued it of being a thief and liar); *Tex. Employers' Ins. Ass'n v. Haywood,* 153 Tex. 242, 266 S.W.2d 856,

858–59 (1954) (counsel urged jury not to believe two witnesses because they were not white); *Sw. Greyhound Lines v. Dickson,* 149 Tex. 599, 236 S.W.2d 115, 120 (1951) (counsel accused physician witness of being motivated by a desire "for whittling flesh" and of employing the same care as a fisherman had for "cutting the guts out" of fish); *Circle Y of Yoakum v. Blevins,* 826 S.W.2d 753, 757 (Tex.App.-Texarkana 1992, writ denied) (counsel accused opposing counsel of manufacturing evidence).

In the instant case, the record reflects that the first mention of the "send a message" theme was made pre-trial during discussions regarding the motions in limine and possible jury questions. Subsequently, during voir dire, there was a general discussion by Bramlett's counsel to the effect that the jury was going to be asked to send a message about what kind of conduct by physicians would and would not be tolerated in Lubbock County. Later, there was one reference to what other juries in Lubbock County had done in other medical malpractice cases. Phillips timely objected, the objection was sustained, and counsel for Bramlett was instructed to rephrase his question, which he did. During opening statements, counsel for Bramlett made references to the fact that Bramlett would be asking the jury to send a message to doctors in Lubbock about what was and was not acceptable conduct. Phillips objected that the opening statement was more in the nature of closing argument, which the court sustained. During presentation of evidence, there was one question regarding sending a message. During final arguments, there were several references to sending a message. However, in each instance, the refrain from Bramlett's counsel was in connection with the evidence and what the community should tolerate as a standard for proper medical care. Thus framed, we cannot say that the argument was one that appealed only to the prejudices of the jury or was so inflammatory as to override the jury's collective ability to review the evidence and base a verdict on the evidence. *Standard Fire Ins. Co.,* 584 S.W.2d at 840. Thus, because we conclude that Bramlett's "send a message" jury argument was not incurable, Phillips waived any error by failing to properly object and obtain a ruling at trial. Tex.R.App. P. 33.1; *Standard Fire Ins. Co.,* 584 S.W.2d at 839. Further, even if the argument had been properly preserved, after reviewing the evidence, we cannot say that the probability that the alleged improper jury argument was harmful is greater than the probability that the verdict was grounded in the evidence adduced at trial. *Standard Fire Ins. Co.,* 584 S.W.2d at 840. Accordingly, Phillips's issue regarding Bramlett's closing argument is overruled.

### Factual Sufficiency of Damage Issues

▆▆▆▆ Phillips next contends that the evidence was factually insufficient to support the award of damages for: 1) conscious pain and suffering, 2) pecuniary loss, 3) loss of companionship and society, and 4) mental anguish. As this is an allegation of factual insufficiency regarding an issue upon which Bramlett had the burden of proof, we will review all of the evidence to determine if it is "so weak, or the contrary evidence so overwhelming, as to render the finding clearly wrong or manifestly unjust." *Lee Lewis Constr., Inc. v. Harrison,* 64 S.W.3d 1, 6 (Tex.App.-Amarillo 1999), *aff'd* 70 S.W.3d 778 (Tex.2001). In our review for factual sufficiency, it is presumed that the jury considered all of the available evidence. *Mo. Pac. R.R. Co. v. Roberson,* 25 S.W.3d 251, 257 (Tex.App.-Beaumont 2000, no pet.). We must also remember that the jury is the sole judge of the credibility of the witnesses and the

weight to be given their testimony. *Killion v. Lanehart,* 154 S.W.3d 183, 191 (Tex. App.-Amarillo 2004, pet. denied).

*Conscious pain and suffering*

■ First, we address the issue of damages for Vicki's pain and suffering. Phillips posits that since he would only have been able to return the phone call regarding Vicki's test results after he left the last surgery, which was at approximately 7:16 p.m., that represents the earliest point at which he would have been able to treat Vicki's deteriorating condition. Further, when Vicki was seen by Phillips's partner, Dr. Richards, at 7:45 p.m., she was incoherent and never regained consciousness. Therefore, Phillips contends that the only applicable time for calculation of Vicki's conscious pain and suffering is approximately 29 minutes.

■ However, the record reflects that at times during the post-operative period, especially after approximately 5:30 p.m., Vicki was beginning to exhibit symptoms of post-operative bleeding. Specifically, she became agitated and confused, she vomited and began feeling a need to go to the bathroom, and she appeared to be having some difficulty breathing. During this time, however, the nurses reported that Vicki's vital signs were stable. According to Phillips's witness, Dr. Richards, when he saw Vicki at 7:45 p.m., she was suffering from hypovolemic shock, because she had bled most of her blood out into her abdomen or pelvic area. No evidence was presented as to how long it would take for a person to bleed to death, however, the medical evidence adduced from the second surgery revealed that there were no sources for the bleeding consistent with rapid loss of blood. Considering all of this information, it would not be irrational for the jury to infer that Vicki was aware of her impending death. When a decedent is aware of their impending death, it is appropriate for the jury to consider that fact in evaluating mental suffering. *Jenkins v. Hennigan,* 298 S.W.2d 905, 911 (Tex.Civ. App.-Beaumont 1957, writ ref'd n.r.e.). Additionally, the jury had evidence before them indicating that Vicki took agonal breaths before she lapsed into unconsciousness, clearly indicating that Vicki was suffering pain at the time. There is some conflict in the evidence regarding when Vicki lapsed into unconsciousness, however, it was for the jury to resolve that conflict, *see McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986), and we cannot say that the jury's resolution of this conflict against Phillips is one that would be clearly wrong or manifestly unjust. *Lee Lewis Constr. Inc.,* 64 S.W.3d at 6. Further, even if the jury believed Phillips's contention that Vicki was only conscious for a thirty minute period, we find the evidence of the pain that she suffered during this period, together with her awareness of her impending death, sufficient to support the jury's verdict. Accordingly, we find the evidence factually sufficient to sustain the jury's award of $1,000,000 for Vicki's pain and suffering.

*Pecuniary loss*

Next, we address Phillips's contention that the evidence supporting the award of pecuniary damages was factually insufficient. The jury awarded pecuniary damages to Vicki's husband, Dale, in an amount of $33,000 for past loss and $500,000 for future loss and to each of Vicki's sons, Shane and Michael, in the amount of $33,000 for past loss and $250,000 for future loss.

■ The elements of pecuniary damages consist of more than just the lost earning capacity of the decedent. *See Best Steel Bldgs., Inc. v. Hardin,* 553 S.W.2d 122, 133 (Tex.Civ.App.-Tyler 1977, writ

ref'd n.r.e.). Additionally, pecuniary loss includes the value of the advice, counsel, services, care, maintenance, and support of the deceased. *Moore v. Lillebo,* 722 S.W.2d 683, 687 (Tex.1986). Although the fact finder is not limited to computation of pecuniary loss based upon the projection of the decedent's future earnings, it is the basic and, some would say, primary element of such an award. *Moorhead v. Mitsubishi Aircraft Int'l,* 828 F.2d 278, 290 (5th Cir.1987). Thus, to assess the factual sufficiency of the evidence supporting the jury's award for pecuniary damages, we must consider both the economic and emotional injury suffered by Bramlett as a result of Vicki's death. *See generally Lee Lewis Constr., Inc.,* 64 S.W.3d at 6.

■ Turning our attention first to the award to Dale, the record reflects that Vicki and Dale were fully engaged as partners within the household. There is testimony about the amount of money that Vicki was making at the time of her death and what her earnings would have been during the balance of her work life. The evidence supports past lost earnings of $64,867 and future lost earnings of $472,499. Moreover, there was considerable testimony about the work that Vicki performed in the home on a day-to-day basis. Evidence shows that Vicki did the cooking, cleaning, purchasing, and laundry for the family. Additionally, the evidence shows that Vicki was the money manager for the family, bookkeeper for Dale's landscaping business, and family tax preparer. The record reflects the approximate value of these services at $19,000 annually. Finally, we must consider the loss of Vicki's advice and counsel. As stated in the testimony, Vicki kept everything together and, without her, the house no longer felt like a home. When this evidence is considered in light of the jury's award to Dale, we cannot say that the award was clearly wrong or manifestly unjust. *See id.*

■ Regarding the awards to Shane and Michael, the record reveals that, at the time of Vicki's death, Michael was still a minor, while it appears that Shane may have reached his majority. Both young men were of majority by the time of the trial. On the date of Vicki's death, both of her sons were living at home with her. There was significant testimony about the role she played in their daily lives. Most of this testimony concerned the advice, counsel, services, care, maintenance and support that Vicki provided each of her sons. While both boys were living at home and attending school, it appears that neither worked for anyone outside the home. There was some testimony about Vicki occasionally giving unspecified sums of money to each of the boys. At some unspecified time after the death of Vicki, but before the trial, Shane and Michael moved to Oregon. It is from this record that we must make a determination of the factual sufficiency of the evidence to support the jury's award of past and future pecuniary damages to Shane and Michael.

As to the award for past pecuniary damages, the evidence shows that both of Vicki's sons were still living at home at the time of Vicki's death. The boys had benefitted from the advice and counsel of Vicki, as well as the household services she performed. Additionally, it appears that neither Shane nor Michael were required to work outside of the home prior to Vicki's death. With these facts in mind, we cannot say that the award of past pecuniary damages of $33,000 for each son was clearly wrong or manifestly unjust. *See Id.*

■ However, the award of future pecuniary damages of $250,000 appears excessive. Again, there was no evidence that Vicki made substantial or even routine financial contributions to the boys. Fur-

ther, the record reflects that Vicki's role as advisor and counselor to the boys was decreasing as the boys were moving toward striking out on their own. Without the financial contribution testimony, the award in question appears to be clearly wrong and manifestly unjust and, therefore, factually insufficient. *Id.* However, the record does support an award of some loss of future pecuniary damages. Accordingly, we recommend that a remittitur is appropriate. We, therefore, suggest a remittitur of $220,000 for the future pecuniary loss award to each son. *See* Tex. R.App. P. 46.3.

### Loss of companionship and society

■ Phillips next contends that the evidence was factually insufficient to support the jury's award for loss of companionship and society to each of the three beneficiaries. The jury awarded Dale the sum of $1,265,000, apportioned $500,000 for past damages and $765,000 for future damages. Michael and Shane each received an award of $2,250,000, apportioned $500,000 for past damages and $1,750,000 for future damages. A review of the Court's Charge reveals that the trial court properly charged the jury about the elements of loss of companionship and society. The charge admonished the jury that loss of companionship and society is different and distinct from damages for mental anguish and that, when considering one, the jury should not include damages for the other. Lastly, the jury was admonished not to let sympathy play any part in their deliberations. Moreover, Phillips did not object to the charge as given.

Phillips posits, in his brief, that "it seems apparent that the jury improperly considered mental anguish" in making its loss of companionship and society award and he further contends, in the alternative, that the jury based the award on sympa-

thy for Bramlett and to punish Phillips. However, these allegations are just that, for nowhere in the record does Phillips point to anything that substantiates these contentions. He simply opines that the size of the award must mean that the jury was improperly considering other matters. As stated above, the jury was properly charged as to each of the matters complained of. The issue of punishment for Phillips had been discussed since voir dire in the context of punitive damages for gross negligence. The jury, in answers to other jury questions, awarded a large sum to Bramlett for mental anguish and found that Phillips was grossly negligent and made a separate award of punitive damages. Therefore, Phillips's true complaint is that the loss of companionship and society award was large and, therefore, was not supported by factually sufficient evidence.

The record reflects that Dale and Vicki enjoyed a harmonious relationship in which each was a full partner in the marriage. While it is true that the work schedules of each left little time for outside interests, the record demonstrates that Dale and Vicki spent their time raising a family and furthering their collective goals. Vicki's efforts at maintaining a home, despite a significant work schedule, along with providing bookkeeping services for Dale's landscaping business demonstrate that the marriage was a true partnership. Further, Dale testified, since Vicki's death, his life had become empty.

The evidence regarding Michael and Shane was demonstrative of the significant role that Vicki played in the lives of the boys. Although they were either at majority or reaching majority shortly, both testified about what the loss of their mother meant to them. She was their personal mentor in all things.

When we apply this evidence to the charge, it is apparent that the relationship Dale, Michael, and Shane had with Vicki was strong. All the family members were living in the home at the time of Vicki's death, there were no extended absences by anyone from the home, and they shared interests, most significantly, the lives of each other. *Moore,* 722 S.W.2d at 688. Additionally, we note that loss of companionship is meant to recompense the surviving members of the family for the positive benefits that flowed to the family from the decedent having been an integral part of it. *Id.* With these factors in mind, we cannot say that the jury's award for loss of companionship and society was clearly wrong or manifestly unjust. *See Lee Lewis Constr. Inc.,* 64 S.W.3d at 6. The mere fact that an award is large is not, in and of itself, indicative that passion, prejudice, or improper motive on the part of the jury resulted in the verdict rendered. *Mo. Pac. R.R. Co. v. Roberson,* 25 S.W.3d 251, 257 (Tex.App.-Beaumont 2000, no pet.). After considering all of the evidence, we cannot say that this award is so flagrantly outrageous, extravagant, and excessive that it shocks the judicial conscious. *Cresthaven Nursing Residence v. Freeman,* 134 S.W.3d 214, 228 (Tex.App.-Amarillo 2003, no pet.). Accordingly, we overrule Phillips's factual sufficiency challenge to the jury's award for loss of companionship and society as to each survivor.

*Mental anguish*

Phillips next contends that the evidence was factually insufficient to sustain the jury's awards of $1,000,000 in mental anguish damages each to Dale, Michael, and Shane. The record reflects that the jury was properly charged about the meaning of mental anguish and the factors that the jury could consider in determining the amount of these damages. The jury was further admonished that mental anguish is separate and distinct from loss of companionship and society and that it should not consider elements of one in the other. Lastly, the jury was given the general admonition about refraining from basing its decisions on bias, prejudice, or sympathy. As with the previous issue, Phillips did not object to the charge as given.

Phillips has cited *Saenz v. Fid. & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996), for the proposition that mental anguish damages could not be awarded unless there was direct evidence of the nature, duration, or severity of plaintiff's mental anguish, thus establishing a substantial disruption in the plaintiff's daily routine. In *Saenz,* the Texas Supreme Court noted that there were only two lines of testimony that could be construed as evidence of mental anguish and that this evidence, at best, constituted proof of mere worry, anxiety, vexation, embarrassment, or anger. *Id.* In the present case, our review of the evidence leads us to conclude that there is direct evidence of the nature, duration, and severity of Dale's, Michael's, and Shane's mental anguish.

It is important to remember the surrounding circumstances that were present at the time of Vicki's death in order to place her death in proper perspective. Vicki entered the hospital for a laproscopic-assisted vaginal hysterectomy. All of the medical professionals who testified, except Phillips,[5] stated that they had never heard of a patient bleeding to death after such a procedure. Dale testified that, on October 29th, the day of the surgery, he expected to have Vicki home shortly. He never considered the possibility that Vicki could die as a result of the surgery. After

---

5. Neither party inquired into Phillips's knowledge of whether a patient had bled to death from a laproscopic-assisted vaginal hysterectomy.

the second surgery, when it became apparent that nothing else could be done for Vicki, Dale had to get the family together to make the decision about whether to unplug the life support equipment that was sustaining Vicki. As a result of Vicki's death, Dale testified that he does not feel like he has a life and that he is now just trying to survive. When asked how the house feels now, Dale related that it is just empty. Although it had been three years since Vicki's death, Dale testified that the hurt he feels is still the same. At the time of trial, Dale stated that, when he comes home he still thinks he hears Vicki in the house, although he knows that cannot be so.

Michael and Shane testified about the sense of loss they each have. Each testified that when their mother went to the hospital, she told them not to worry and that it was just going to be for a short time. As a result of losing their mother, the boys moved to Oregon, where Vicki's identical twin sister lives. Although the move had helped, it was not the same. Michael and Shane both testified that they still talk about their mother almost every day. Michael stated that he keeps a picture of his mother on his bedroom wall. Each testified that the home was not the same after Vicki died and that this was a big reason that they moved to Oregon.

■ Mental anguish represents the emotional pain, torment, and suffering experienced as a result of the death of a family member. *Moore*, 722 S.W.2d at 688. Further, mental anguish is meant to compensate the survivors for "their harrowing experience resulting from the death of a loved one." *Id.* In determining mental anguish damages, the jury is trying to determine the adverse effect the death has had upon the survivors. *Id.*

Based upon our review of the evidence, it is apparent that Dale, Michael, and Shane each testified about the day-to-day effect that the death of Vicki has had upon them. It is apparent that the survivors of Vicki have suffered more than mere worry, anxiety, vexation, embarrassment, or anger. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995); *Saenz*, 925 S.W.2d at 614. Inasmuch as there is factually sufficient evidence to support the award of mental anguish damages, it was up to the jury to determine the fair and reasonable compensation for the loss involved. *Saenz*, 925 S.W.2d at 614. We cannot say that the jury's award of $1,000,000 to each of the survivors was clearly wrong or manifestly unjust. *See Lee Lewis Constr. Inc.*, 64 S.W.3d at 6. Accordingly, Phillips's challenge to the factual sufficiency of the mental anguish damages award is overruled.

Having overruled all of Phillips's challenges to the factual sufficiency of the evidence to support the award of the various damage elements, except for the award of future pecuniary damages to Michael and Shane, we affirm the judgment's award of those damages. In the case of the award for future pecuniary damages to Michael and Shane, we suggest a remittitur of $220,000 for the award to both Michael and Shane. If the remittitur is accepted, we overrule all of Phillips's contentions regarding the damages awarded.

### Failure to Apply Statutory Damage Caps

■ Phillips next contends that the trial court committed reversible error by failing to apply the damage caps of article 4590i, section 11.02, to the jury's award of non-economic damages to Bramlett. According to Phillips, the correct application of the damage caps would result in a reduction of the jury award from $9,196,364.50 in actual damages and pre-

judgment interest to $1,585,365.85. After the return of the jury verdict, Phillips filed a motion for judgment notwithstanding the verdict requesting that the trial court disregard the jury findings and enter judgment consistent with the damage caps. The trial court denied the motion and Phillips subsequently filed a motion to correct, modify, or reform the judgment along with a motion for new trial requesting the same relief. Again, the trial court denied the motions.

The statute at issue in this matter is the Medical Liability and Insurance Improvement Act, as passed by the 65th Legislature. Specifically, it is the meaning of section 11.02(a) and (c) that this issue concerns. The applicable sections provide:

11.02 Limit on Civil Liability

(a) In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $500,000.

\* \* \*

(c) This section shall not limit the liability of any insurer where facts exist that would enable a party to invoke the common law theory of recovery commonly known in Texas as the "Stowers Doctrine."

art. 4590i, § 11.02(a),(c).

■■■ The "Stowers Doctrine" is a common law doctrine first enunciated in *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holdings approved). The "Stowers Doctrine" permits an insured to maintain a cause of action against his insurer for the negligent failure of the insurer to settle a claim within applicable policy limits. *Id.* at 547–48. The elements of a "Stowers Doctrine" claim are (1) the claim against the insured was within the scope of coverage, (2) there was a settlement demand within policy limits, and (3) the terms of the demand were such that an ordinary prudent insurer would have accepted, considering the likelihood and degree of the insured's potential exposure to an excess judgment. *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 849 (Tex.1994).

■■■ We review the proper application of the damage caps under a *de novo* standard of review. This is so because we must construe the statute in question, which constitutes a question of law. *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex.2002). Our goal is to give effect to the legislative intent. *See* TEX. GOV'T CODE ANN. §§ 311.021, 311.023, 312.005 (Vernon 2005),[6] *Kroger Co. v. Keng*, 23 S.W.3d 347, 349 (Tex.2000). In trying to arrive at the legislative intent, we first look to the plain and common meaning of the words used. *Sorokolit v. Rhodes*, 889 S.W.2d 239, 241 (Tex.1994). Further, we must construe the statute as a whole, not its provisions in isolation. *Cont'l Cas. Co. v. Downs*, 81 S.W.3d 803, 805 (Tex.2002). Pursuant to statute, we may also look at other matters, to help us determine the legislature's intent, such as: 1) the objective sought to be obtained by the statute; 2) the circumstances under which the statute was enacted; 3) the legislative history of the statute; 4) common law or former statutory provisions, including laws on the same or similar subjects; 5) the consequences of a particular construction; 6) any administrative constructions of the statute; and 7) the statute's

---

**6.** Further references to Texas Government Code provisions will be by reference to "§ __."

title (caption), preamble, and emergency provision. § 311.023. Finally, in applying the plain and common meaning of the words, we are cautioned not to enlarge, by implication, the meaning of any word beyond its ordinary meaning in a manner that would enlarge the meaning of the statute. *Sorokolit,* 889 S.W.2d at 241.

Phillips's position regarding the interpretation of the applicable section of the statute is founded upon the opinion of the Second District Court of Appeals in *Welch v. McLean,* 191 S.W.3d 147 (Tex.App.-Fort Worth 2005, no pet.). The *Welch* court's opinion focused on what it felt was the plain and common meaning of the phrase "this section shall not limit the liability of any insurer" found in art. 4590i, section 11.02(c). *Id.* at 168. Under the court's analysis, in its plain and common meaning the term "insurer" does not include a physician. *Id.* Therefore, the court concluded that to hold that art. 4590i, section 11.02(c), lifted the damage cap on physician liability established by section 11.02(a) would impermissibly enlarge the meaning of the terms of the statute. Additionally, the *Welch* court determined that the other terms used in art. 4590i, section 11.02(a), indicated that the legislature never intended section 11.02(c) to impact the damage cap. *Id.* The court's analysis keyed on the phrase, "in an action on a health care liability claim." Art. 4590i, § 11.02(a). The *Welch* court stated that, since a "health care liability claim" can only be asserted against a physician or health care provider, an insurer can never be liable for a patient's health care liability claim under the statute. *Welch,* 191 S.W.3d at 168. Therefore, the insurer's "Stowers" liability can only be owed to the insured physician. *Id.* Finally, the *Welch* court posits that to allow the construction of the statute urged by the McLeans, appellants therein, would foster the absurd result that the physician would be liable for the total amount of the

judgment, without application of the caps, if his "Stowers" action was unsuccessful on the merits. *Id.* at 171.

■■■ Our review of the statute and utilization of the permissible aids to construction lead us to a construction contrary to that reached by the *Welch* court. Initially, we note that the *Welch* court did not attempt to construe the words, "This section ..." at the beginning of art. 4590i, section 11.02(c). To ascertain what the words "This section ..." mean, we look to the construction aids found in the Government Code. Section 311.006, Internal References, provides:

In a code:

(1) a reference to a title, chapter, or section without further identification is a reference to a title, chapter, or section of the code; and

(2) a reference to a subtitle, subchapter, subsection, subdivision, paragraph, or other numbered or lettered unit without further identification is a reference to a unit of the next larger unit of the code in which the reference appears.

§ 311.006. Therefore, the reference to "This section ..." at the beginning of section 11.02(c) of art. 4590i can only mean that the language that follows applies to the entirety of section 11.02. Thus, we construe section 11.02(c) to preclude any application of section 11.02(a) in a manner that would limit the liability of an insurer in a subsequent "Stowers" claim.

However, as noted above, the *Welch* court concluded that our construction of section 11.02 of art. 4590i would lead to an absurd result. *Welch,* 191 S.W.3d at 171. According to *Welch,* the absurd result would arise in situations where the physician is unsuccessful in his "Stowers" action and would have to bear the entire burden of the uncapped judgment. *Id.* For this

possibility to be considered an absurd result, we must assume that the legislature intended to abrogate the "Stowers" doctrine by enacting art. 4590i. In a typical "Stowers" action, an unsuccessful insured will always bear the entire burden of the underlying judgment. By enacting the damage caps of section 11.02(a), the legislature provided certain statutory protections to physicians and health care providers, but expressly excepted successful health care liability claims "where facts exist that would enable a party to invoke the 'Stowers Doctrine.'" Art. 4590i, § 11.02(c). Thus, before the trial court may enter judgment in a medical liability case, it must determine whether facts exist that would enable a party to invoke the "Stowers Doctrine."

Our construction of section 11.02(c) is consistent with the purposes of the statute. *See* § 311.023(1). In section 1.02(b) of art. 4590i, the legislature provided that art. 4590i's purpose was to improve and modify the health care liability claims system, but it was to "do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." Art. 4590i, § 1.02(b)(3).

Additionally, the legislative history of art. 4590i shows that the legislature did not intend to interfere with "Stowers" claims. Beginning with the debate before the House State Affairs Committee, where the original H.B. 1048[7] was being considered, there was discussion of the "Stowers Doctrine" and the use of the doctrine to ensure that a physician's insurance carrier bargained in good faith. During a general discussion of negotiations and bargaining in good faith after the filing of a medical liability claim, Rep. Henderson said:

> What she's talking about—members, those of you that are not attorneys, we have an old theory in law that's called the Stowers Doctrine. And what it says is, is that if you do not bargain in good faith—and this is kind of a loose term— a loose definition—but this is the essence of it—if you don't bargain in good faith, you try to hide the ball, then you're—then you have no limits on your liability. So the Stowers Doctrine is in here, and this will be an incentive for all parties to participate in good faith. And this kind of answers, I think, what you're talking about, Mr. Hoestenbach.

Texas Medical Liability & Insurance Improvement Act: Hearings on H.B. 1048 before the House Comm. on State Affairs, 65th Leg. (March 14, 1977) (statement of Rep. Henderson). Subsequently, during floor debate on the bill, Rep. Powers made the following statements:

> Also, in paragraph (b)1, the original committee substitute or bill has a section dealing with the Stowers Doctrine which, as many of you know, is an insurance leverage negotiation device. Frankly, it deals with the demands for settlement within policy limits and that's the name of a San Antonio Furniture Company that invoked the doctrine in that it imposes a certain degree of liability. That liability goes to the insurance company or insuror and not the physician, doctor, health care provider and so, in this amendment, we simply change the language to reflect that. That that is what the Stowers Doctrine does. It runs to the insuror. They are liable if they fail to settle within those policy limits. That is simply a clean-up type of amendment. We didn't alter the committee concept on the Stowers Doctrine.

Debate on H.B. 1048 on the Floor of the House, 65th Leg. (second reading) (March 22, 1977). The "liability" that Rep. Powers was referring to was the original draft of

---

**7.** H.B. 1048, when enacted, became art. 4590i.

H.B. 1048 that would have allowed the filing of a "Stowers" claim directly against a doctor or health care provider. In an attempt to remove any ambiguity related to the initial "Stowers" provision, Mr. Ace Pickens, the representative of the Texas Medical Association, testified:

> There is one thing that I hope you will consider and that is a section in the bill that relates to the Stowers doctrine of which I am sure you are familiar with. It's always been my understanding that the Stowers doctrine applied to insurers and not to the defendants. I believe that they have perhaps created another cause of action in this bill because they made the so-called Stowers Doctrine apply to insurer, physician, or health care provider, and I would hope that you would take out the word physician or health care provider and just leave the Stowers doctrine applying to the insurance company where it always has been heretofore.

Texas Medical Liability & Insurance Improvement Act: Hearings on H.B. 1048 before the Senate Comm. on Jurisprudence, 65th Leg. (March 30, 1977). Later, during discussions on the floor of the Senate about limits on liability,[8] Sen. Farabee stated:

> In addition, there's a provision in here for a Stowers doctrine to apply that if the insurance company is negligent in not settling within that $100,000, then they can be liable for $300,000 if the jury finds that. So, we tried to retain all those things that would contribute to settlement, . . . .

Debate on H.B. 1048 on the Floor of the Senate, 65th Leg. (April 17, 1977). Ultimately, the bill that was passed removed the "doctor or health care provider" language from section 11.02(c). Art. 4590i,

§ 11.02(c). However, our review of the legislative history of H.B. 1048 reveals a consistent intent by the legislature to provide liability protection for doctors and health care providers without limiting an insurer's liability in a "Stowers" claim.

From the excerpted portions of the legislative history, we ascertain that the legislature intended for the "Stowers Doctrine" to retain its common law form. This intent is most evident in the discussion of how the "Stowers Doctrine" encourages insurers to bargain in good faith during the negotiation phase of a medical malpractice case. Accordingly, we conclude that the legislative history of art. 4590i supports our construction of section 11.02 as not limiting the liability of an insurer against whom a "Stowers" claim could be invoked.

Next, we are mindful of former Chief Justice Phillips's dissenting opinion in *Lucas v. U.S.*, 757 S.W.2d 687 (Tex.1988), wherein Chief Justice Phillips discussed why he felt art. 4590i was constitutional. In discussing the criticisms made by the majority that the legislature passed art. 4590i as a speculative experiment, Chief Justice Phillips observed:

> Far from engaging in undisciplined speculation, the Legislature attempted in this instance to meet a complex social problem by limiting damages "in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." Tex.Rev.Civ. Stat. art. 4590i, § 1.02(a)(3). The exclusion of all medical damages from the limits, the inflation adjustment provisions, the limitation on a per defendant rather a per occurrence basis, and **the exclusion of Stowers claims** from the limits all indi-

---

**8.** At the time of Sen. Farabee's statement, the proposed caps were for an overall cap of

$500,000, with a specific non-economic damages cap of $100,000.

cate a legislative solicitude for the injured claimants.

*Id.* at 720 (emphasis added).

Finally, Phillips contends that, even if this court finds that section 11.02(c) of art. 4590i applies, the proof provided by Bramlett was not sufficient to trigger an invocation of the "Stowers Doctrine." Phillips then admits that the first two elements of a "Stowers" claim were provided to the trial court, but asserts that Bramlett failed to produce evidence on the third element, that the terms of the demand are such that an ordinary and prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment. The jury has spoken to the third issue by its verdict and findings that led to the judgment of which Phillips is now complaining. The proof was sufficient to permit the trial court to "find that facts exist that would enable a party to invoke the common law theory of recovery commonly known in Texas as the 'Stowers Doctrine.'" Art. 4590i, § 11.02(c).

Because the trial court found that the present case presented facts which would allow the invocation of a "Stowers" claim and because we construe art. 4590i, section 11.02(c), as making the damages cap of section 11.02(a) inapplicable in that event, we conclude that the trial court did not err in refusing to apply the damage caps to the judgment rendered.

### Legal and Factual Sufficiency of Evidence of Gross Negligence

 Phillips next contends that the evidence was neither legally nor factually sufficient to support the jury's finding of gross negligence. When both legal and factual insufficiency are alleged, we should address the issue of legal insufficiency first. *Glover*, 619 S.W.2d at 401.

To recover exemplary damages, Bramlett was required to prove that Phillips acted grossly negligent by clear and convincing evidence. Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (Vernon Supp.2006). To meet the clear and convincing standard, Bramlett was required to present evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id.* at § 41.001(2). Because the standard of proof for gross negligence is higher than that for traditional negligence, so too, the standard of review will be heightened. *City of Keller*, 168 S.W.3d at 817 (*citing Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex.2004)). The requirement for a heightened standard of review means that we must review all of the evidence, not just the evidence favorable to the verdict, and may not disregard evidence contrary to the verdict. *City of Keller*, 168 S.W.3d at 817.

As previously stated, to recover exemplary damages, Bramlett had to prove by clear and convincing evidence that Phillips acted grossly negligent. Gross negligence is defined as "an act or omission: (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others." Tex. Civ. Prac. & Rem.Code Ann. § 41.001(11) (Vernon Supp.2006). The two parts of the definition of gross negligence are described as the objective test and the subjective test respectively. *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex.2001). Setting aside the objective test for the moment, we will focus our inquiry on the subjective test.

The second element of gross negligence, the subjective test, requires proof that Phillips had actual awareness of Vicki's peril, but, by his actions, demonstrated that he did not care. *Id.* at 787. Within the context of the allegations and proof, Bramlett alleged that, when Phillips left the hospital at approximately 7:16 p.m., he had actual awareness of Vicki's condition and, by leaving, demonstrated conscious indifference to her plight. However, the evidence shows only that Phillips had ordered the H & H test and fluid challenge at approximately 5:30 p.m., but had not received the results of these tests. The last time Phillips had received information regarding Vicki's condition, the nurses at the hospital had reported that Vicki's vital signs were stable but that she had low urine output. The cause of Vicki's low urine output was hotly contested during the trial, however, the evidence established that it could have been the result of either dehydration or internal bleeding. Although Phillips testified that a possible concern for internal bleeding along with dehydration lead him to order the H & H test and Fluid Challenge, there is no evidence that suggests that Phillips had actual knowledge that Vicki was bleeding when he left the hospital. Because it is the actual awareness of Phillips that is the test, what he should have known is not the controlling inquiry. *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994). Bramlett contends that, because Phillips knew internal bleeding was a "significant" risk of the surgery, there was an urgency in finding out what was causing the low urine output. Additionally, Bramlett contends that Vicki displayed "classic symptoms" of internal bleeding that Phillips must have recognized, but chose to ignore. The problem with this analysis is that it assumes that Phillips should have put all of these signs together and concluded that Vicki was actually bleeding to death internally. There is no evidence in the record that proves that Phillips did put these signs together and, as a result, was actually aware that Vicki was bleeding internally. TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(11) (Vernon Supp.2006), *Transp. Ins. Co.,* 879 S.W.2d at 25. Without proving Phillips's actual awareness of the risks involved, there can be no proof that the actions of Phillips were taken in conscious indifference to the welfare of Vicki. TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(11) (Vernon Supp.2006). It is this actual awareness of the risks that demonstrates the state of mind of the actor that separates gross negligence from ordinary negligence. *Diamond Shamrock Ref. Co. v. Hall,* 168 S.W.3d 164, 173 (Tex.2005).[9] In the present case, there is not legally sufficient evidence to demonstrate, clearly and convincingly, that Phillips had actual awareness of the danger Vicki was in but chose to consciously disregard the risk by leaving the hospital. Accordingly, we find the evidence legally insufficient to sustain the jury's finding of gross negligence against Phillips. Having disposed of the issue under the subjective test, we need not address the sufficiency of the evidence regarding the objective portion of the test for gross negligence. *See* TEX.R.APP. P. 47.1.

Having determined that the evidence was legally insufficient to support the jury's finding of gross negligence, we reverse that portion of the judgment.

## Conclusion

We reverse and render a take-nothing judgment in favor of Phillips on the issue

---

**9.** We note that the experts testified that this was the only case they had ever heard of where a patient bled to death after a laproscopic-assisted vaginal hysterectomy. This evidence further convinces us that the proof of Phillips's actual awareness of Vicki's peril was legally insufficient to show that Phillips acted grossly negligent.

of gross negligence. We suggest a remittitur in the amount of $220,000 as to both Shane and Michael on the issue of future pecuniary loss. If within 30 days of the date of this opinion, Shane and Michael make a remittitur of that amount, our judgment reforming the trial court's judgment to reduce Shane and Michael's damages in the sum of $220,000 will issue. If Shane and Michael do not accept the remittitur, we will reverse the trial court judgment, except that portion herein rendered, and remand the cause for a new trial. Tex.R.App. P. 46.3. If remittitur is made as suggested above, the judgment of the trial court will be reformed to so reflect. In all other respects, we affirm the judgment of the trial court.

CAMPBELL, J., dissenting.

REAVIS, S.J., concurs in result only.

JAMES T. CAMPBELL, Justice, dissenting.

For the reasons expressed in *Welch v. McLean*, 191 S.W.3d 147 (Tex.App.-Fort Worth 2005, no pet.), I would sustain appellant's third issue complaining of the trial court's failure to apply the damage caps prescribed by section 11.02 of former article 4590i. I do not disagree with the majority's disposition of the other issues raised in the appeal, but because application of the damage caps would require reversal of the trial court's judgment and remand of the cause, I must respectfully dissent from this court's judgment.