**Marelyn MEDINA, M.D., Appellant,**

v.

**Michael B. HART, Appellee.**

No. 13–04–436–CV.

Court of Appeals of Texas,
Corpus Christi–Edinburg.

July 5, 2007.

Rehearing Overruled Nov. 15, 2007.

Thomas F. Nye, Vidaurri, Lyde, Gault & Quintana, Corpus Christi, for appellant.

Keith C. Livesay, Ricardo A. Garcia, McAllen, for appellee.

Before Justices RODRIGUEZ, GARZA, and BENAVIDES.

## OPINION

Opinion by Justice BENAVIDES.

This appeal arises from a medical malpractice lawsuit that was tried to a jury verdict. Appellee, Michael Hart, brought suit against appellant, Marelyn Medina, M.D., for injuries he sustained during surgery to remove a kidney stone. The jury found Dr. Medina negligent and awarded damages. On appeal, Dr. Medina argues that the trial court erred in admitting expert testimony from a witness who was not qualified under former article 4590i of the Medical Liability and Insurance Improvement Act of Texas.[1] Dr. Medina claims that without this testimony, there was no evidence that she breached the standard of care and that this breach caused appellee's injury. We affirm.

### I. BACKGROUND

Hart is a missionary in Veracruz, Mexico. In November 2001, he returned to the United States to seek treatment for kidney stones. His wife, Teresa Hart, contacted Dr. Medina, who agreed to see him.

Dr. Medina examined Hart and determined that a kidney stone was blocking the tubes to his left kidney. At first, Dr. Medina recommended a non-invasive surgery[2] to break the kidney stone apart, but after complications arose, she determined that invasive surgery was required.[3]

Hart was admitted to Rio Grande Regional Hospital for surgery on November 16, 2001. He was placed under general anesthesia. Dr. Medina testified that prior to the surgery, Hart was positioned on the operating table with his right side down. His left side was exposed upward so that Dr. Medina could access the left kidney.

Dr. Medina testified that she supervised the placement of cushioning devices used in positioning Hart for surgery. Hart's right arm was raised above his head, and a cushioning device was placed in his right axilla, or his right underarm, to prevent nerve damage to his shoulder and arm. Dr. Medina testified that she personally placed an IV bag—a bag primarily used to infuse liquids into a person's body through the veins—under Hart's right arm as a cushioning device. Although Dr. Medina testified that she often used IV bags for this purpose, the parties disputed whether this was a proper use. Dr. Medina per-

---

1. *See* TEX.REV.CIV. STAT. art. 4590i, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884 (now codified at TEX. CIV. PRAC. & REM.CODE § 74.401 (Vernon)). Because this suit was filed on August 1, 2003, and article 4590i was repealed effective September 1, 2003, former article 4590i governs this case. *Id.*

2. Dr. Medina initially recommended a lithotripsy, which uses shock waves to pulverize kidney stones non-invasively.

3. Dr. Medina performed a pyelolithotomy, an invasive surgery where the doctor surgically removes the kidney stone.

formed the surgery but was unable to remove the kidney stone.

After surgery, when Hart awoke, he began to complain of pain underneath his right arm. Upon inspection, nurses discovered blisters on Hart's right axilla, where the IV bag had been placed for cushioning. After several visits to Dr. Medina over the following weeks, Dr. Medina referred Hart to Rafael Avila, M.D. Dr. Avila diagnosed Hart's condition as second and third degree burns under his right arm. Dr. Avila recommended and performed a skin graft after removing necrotic, or dead, tissue from the area. Hart subsequently lost feeling in that area, is unable to sweat, and suffered other complications from the burns.

Hart filed a medical negligence suit on August 1, 2003 under former article 4590i. He alleged that Dr. Medina negligently used the IV bag as a positioning device, resulting in second and third degree burns to Hart. Hart designated Phillip Diggdon, M.D. as his expert witness to testify about the standard of care, breach, and causation.

At his deposition, Dr. Diggdon opined that Dr. Medina bore ultimate responsibility for positioning Hart during surgery. He testified that the standard of care was to safely place a positioning device under the right axilla during the surgery. Dr. Diggdon testified that Dr. Medina breached the standard of care for positioning Hart during surgery by using a "red hot" IV bag to cushion Hart's right axilla, which caused Hart's second and third degree burns.

After this deposition, Dr. Medina filed a motion to strike Dr. Diggdon as Hart's expert. Dr. Medina claimed that Dr. Diggdon was not qualified to testify under former article 4590i, section 14.01. Specifically, Dr. Medina argued that Dr. Diggdon was not practicing medicine at the time of the injury or at the time of his testimony because Dr. Diggdon retired from active practice approximately one month before Hart's operation. Additionally, Dr. Medina argued that Dr. Diggdon was unqualified because he was not a burn expert. Dr. Medina did not ask the trial court to dismiss the case—rather, she only requested that the trial court strike Dr. Diggdon as Hart's expert.[4]

In response, Hart filed a supplemental affidavit from Dr. Diggdon. It recited Dr. Diggdon's qualifications and stated that Dr. Diggdon had been serving as a consulting physician since closing his practice:

I am a board certified urological surgeon with 38 years experience in active patient practice. My medical training and background encompasses all aspects of my patient's care beginning with safe entry into the operating suite, patient positioning to safeguard from passive injury and meticulous surgical preparation including the performance of procedures such as the pylolithotomy made the basis of this matter. Approximately one month prior to the date of this incident, I had closed my practice. However, at that time and continuing to the present, upon the request of my peers, I have continued to serve as a consulting physician to those physicians who provide direct patient care in my field of expertise. Additionally, I have continued to update my medical edu-

---

4. Article 4590i, section 14.01 governs qualifications of experts and the time frame for a court's pre-trial ruling on admissibility. Tex. Rev. Civ. Stat. Ann. art. 4590i § 14.01. Unlike section 13.01, which provides for dismissal if a plaintiff fails to comply with deadlines for serving an expert report, section 14.01 does not provide for dismissal of a case for lack of a qualified expert. *Id.*

cation through attending conferences detailing new procedures and techniques.

The trial court held a hearing on the motion to strike. Dr. Medina objected to Dr. Diggdon's affidavit on the grounds that it was untimely. The trial court did not rule on this objection. Although Dr. Medina represents on appeal that she objected to the affidavit as conclusory because it did not detail with whom Dr. Diggdon had consulted, the record does not reflect that such an objection was made. The trial court denied Dr. Medina's motion to strike Dr. Diggdon as Hart's expert. The case then proceeded to trial.

At trial, Dr. Diggdon testified by video as Hart's expert, and Dr. Medina re-urged her objection to his qualifications. The trial court again overruled Dr. Medina's objection and allowed Dr. Diggdon to testify by video deposition.

Dr. Medina was questioned extensively by both sides at trial. She stated that Rio Grande Regional Hospital policy required her, as the surgeon, to properly assess her patient for positioning needs and have positioning devices readily available. She also admitted that it was her responsibility to make sure that Hart was not going to be injured as a result of being on the operating table and unconscious for the duration of the surgery:

Q: I mean, you've got—you as a doctor having knowledge got [sic] to take the time and the effort to make sure that he is not going to be injured as a result of just being on the table and unconscious for whatever length of time that the surgery takes, true?

A: True.

Dr. Medina's attorney elicited an admission from Dr. Medina that placing a hot IV bag under someone's body would be a breach of the standard of care:

Q: All right. So there's no question about this. Do we need a paid expert from Oklahoma to come in and tell us that you shouldn't put a hot bag, a red hot bag underneath a patient's armpit? I mean, would you agree that that shouldn't be done?

A: That shouldn't be done, sir.

She testified that Dr. Avila diagnosed Hart's injury as a burn, and although she initially disagreed with this diagnosis, she stated at trial that "[a]t this time I would say that [Hart] suffered a burn." She testified that Hart's burn was in the same location as the IV bag and approximately the same size. Although she disputed whether the bag was hot when she placed it under Hart's arm, Dr. Medina testified that regardless of the heat source, the IV bag that she placed under Hart's arm was warm and caused Hart's burn:

Q: Dr. Medina, regardless of the heat source, it was the IV bag that became warm and burned Mr. Hart, regardless of the heat source, correct?

A: That is the what the working diagnosis is.

Q: That is—that is the only thing that injured Mr. Hart was a hot IV bag from some heat source, correct?

A: I would assume, yes.

Q: Okay. That would be fact, wouldn't it? Was there anything else under his armpit than this IV bag?

A: The only thing there that I know of was the bag.

Q: So therefore regardless of the heat source it was an IV bag that caused injury to Mr. Hart during the operation?

A: I would assume that is.

Q: And it was you who put the IV bag there?

A: That is correct, sir.

The parties' main dispute at trial was over how the IV bag became heated. Dr. Medina denied that the bag was heated when it was handed to her before she placed it underneath Hart's arm. She could not remember whether it was wrapped in a towel when it was handed to her, but if so, she testified that she would have removed the towel prior to placing it under Hart. She testified that she touched the bag, and it was not hot. Dr. Medina theorized that it was possible that the bag was heated after being placed under Hart's arm.

Cesar Guerra, the circulating nurse on duty at the time of Hart's surgery, testified that the IV bag was wrapped in a surgical towel prior to being placed under Hart's arm. He testified that there was an IV bag-warmer outside the operating room that was often used to heat IV fluids in the bags prior to being administered to a patient. Although he testified that the IV bag was not taken off a warmer before Dr. Medina positioned it, he had no personal knowledge of whether the IV bag was previously warmed.

Teresa Hart testified that Guerra told her that the IV bag had been heated and then wrapped in a towel prior to being placed underneath her husband's arm. She also testified that after the surgery, she and her husband visited Dr. Medina's office. She recounted her conversation with Guerra to Dr. Medina and questioned Dr. Medina about the use of a heated IV bag. At that point, Dr. Medina became very upset, denied using a heated IV bag, and left the room. Teresa testified that after Dr. Medina left the room, Dr. Medina's employee, Lily, stated, "I wish some people would just simply tell the truth." Hart corroborated this testimony, but he added that Lily told him that the IV bag was "too hot."

In closing arguments, Dr. Medina's attorney made the following arguments about the issues in the case, including the standard of care and breach:

> This case is about one question. The question is: Was the IV bag red hot when Dr. Avila–Dr. Medina put it under Mr. Hart? That is the only issue in this case. Was it red hot? ... First of all, if it was red hot, there was a breach in the standard of care. Dr. Avila–I mean, Dr. Medina will admit to that. If she actually put a red hot bag underneath Mr. Hart's arm, that was a breach. Okay. You don't need an expert from Oklahoma to tell you all of that.

Dr. Medina's attorney then summarized and attempted to discredit the testimony that the bag was hot, referencing the Harts' testimony regarding statements made by Dr. Medina's nurse, Lily.

The jury found that Dr. Medina was negligent and that her negligence proximately caused Hart's injury. The trial court rendered judgment on the verdict, and after applying settlement credits, awarded Hart $193,000.00 against Dr. Medina, plus prejudgment and post-judgment interest and costs. This appeal ensued.

## II. STANDARD OF REVIEW

 Dr. Medina argues on appeal that the trial court erroneously admitted Dr. Diggdon's testimony because Dr. Diggdon was not qualified. A trial court's ruling on an expert's qualifications is reviewed under an abuse of discretion standard. *Broders v. Heise,* 924 S.W.2d 148, 151 (Tex.1996). "'The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles.'" *Id.* (quoting *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995)).

To obtain reversal based on the trial court's error in the admission of evidence, however, Dr. Medina must further show that the error probably caused the rendition of an improper judgment. Tex. R.App. P. 44.1(a); *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). To make this determination, we must review the entire record. *Nissan*, 145 S.W.3d at 144. The complaining party must generally demonstrate that the "judgment turns on the particular evidence admitted." *Id.* Although it sounds simplistic, and often is, application of this standard is also sometimes difficult and dependent on the facts of that particular case:

> Clearly, erroneous admission is harmless if it is merely cumulative. But beyond that, whether erroneous admission is harmful is more a matter of judgment than precise measurement. In making that judgment, we have sometimes looked to the efforts made by counsel to emphasize the erroneous evidence and whether there was contrary evidence that the improperly admitted evidence was calculated to overcome.

*Id.* (citations omitted).

### III. Application

Initially, we note that Dr. Medina's briefs merely state that absent Dr. Diggdon's testimony, there is no evidence that Dr. Medina's negligence caused Hart's injuries.[5] Otherwise, Dr. Medina's briefs focus entirely on the admissibility of Dr. Diggdon's testimony. Dr. Medina did not attempt to point out and distinguish the portions of the record, referenced above, that might be construed as otherwise supporting the judgment. We could reject Dr. Medina's arguments solely based on her failure to brief and demonstrate reversible error. Tex.R.App. P. 38.1(h); *Indian Beach Prop. Owners' Ass'n. v. Linden*, 222 S.W.3d 682, 693 (Tex.App.-Houston [1st Dist.] 2007, no pet.); *Ford Motor Co. v. Castillo*, 200 S.W.3d 217, 232 (Tex.App.-Corpus Christi 2006, pet. filed).[6]

We have reviewed the record for reversible error, however, because this case is very unique. While we recognize that a medical malpractice plaintiff must generally present expert testimony to support their claims of negligence and causation, *Garza v. Levin*, 769 S.W.2d 644, 646 (Tex. App.-Corpus Christi 1989, writ denied), this is not the typical medical negligence case. *See Murphy v. Russell*, 167 S.W.3d 835, 838 (Tex.2005) ("It may be that once discovery is complete and the case is tried, there is no need for expert testimony."). In most medical malpractice cases, the physician's actions or inactions are well documented, and there is no dispute whether an action or inaction by the physician actually occurred. Rather, the dispute typically focuses on whether the undisputed action or inaction constituted negligence that proximately caused an injury.

---

5. Again, we note that Dr. Medina did not ask the trial court to dismiss the case pre-trial under section 13.01 of article 4590i for the absence of an expert report. Rather, she filed a motion to strike Dr. Diggdon as Hart's expert as unqualified, specifically requesting only that the trial court "prohibit Dr. Diggdon from testifying." She re-asserted this objection at trial. Therefore, we cannot presume that this case would not have gone forward past the point of an expert review of the case because Dr. Medina did not ask for dismissal.

We must review all the evidence in the record to determine if the trial court's ruling on Dr. Medina's objection was reversible error.

6. Dr. Medina points to only the fact that the "jury's verdict, which imposes liability on Dr. Medina based on unqualified expert testimony, establishes harm." Such a statement could be made by an appellant in any case and is not sufficient under the Texas Rules of Appellate Procedure to support review.

■ This case is different. The main issue at trial in this case was how and when the IV bag became heated-not whether placing a hot IV bag under someone's arm would be negligent and cause a burn. As demonstrated below, Dr. Medina judicially admitted negligence and causation, and therefore, contrary to Dr. Medina's argument, Dr. Diggdon's testimony was not the only evidence that the bag was hot when Dr. Medina placed it under Hart's arm. Dr. Medina cannot establish reversible error in this case because Dr. Diggdon's testimony was merely cumulative of Dr. Medina's testimony and testimony from the Harts. *See Nissan*, 145 S.W.3d at 144.

■ In rare cases, a defendant makes a conclusive, judicial admission on the elements of negligence and causation. *See Grider v. Naaman*, 83 S.W.3d 241, 245–46 (Tex.App.-Corpus Christi 2002), *rev'd on other grounds*, 126 S.W.3d 73, 74–75 (Tex. 2003) (holding that evidence conclusively established negligence and causation because surgeon judicially admitted that his action breached the standard of care and caused plaintiff's injury). Testimonial admissions will be treated as conclusive, judicial admissions if (1) the statement was made during a judicial proceeding; (2) it was contrary to an essential fact embraced in his theory of defense; (3) it was deliberate, clear, and unequivocal, thereby eliminating the hypothesis of mere mistake or slip of the tongue; (4) giving conclusive effect to the declaration would be consistent with public policy; and (5) the statement was not destructive of the opposing party's theory of recovery. *Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex.1980). A judicial admission relieves the opposing party's burden of proof on an issue. *Id.* In fact, a judicial admission bars the party admitting the fact from later disputing its existence. *Grider*, 83 S.W.3d at 246.

In conducting a legal sufficiency review of a judgment in a medical malpractice case, the Amarillo Court of Appeals recently found legally sufficient evidence of both negligence and causation based in part on the judicial admissions of the physician defendant. *See Phillips v. Bramlett*, No. 07–05–0456–CV, — S.W.3d —, —, 2007 WL 836871, at *5, 2007 Tex. App. LEXIS 2124, at *16–18 (Tex.App.-Amarillo Mar. 19, 2007, no pet.). There, Phillips performed a hysterectomy on Vicki Bramlett, and after surgery, ordered immediate blood tests to determine the cause of unusual urine output. *Id.* at —, 2007 WL 836871, at *1, 2007 Tex.App. LEXIS 2124, at *2–3. While the tests were performed, Phillips assisted in another surgery, and then he left the hospital. *Id.* at —, 2007 WL 836871, at *1, 2007 Tex.App. LEXIS 2124, at *3–4.

The nurses on duty sent Phillips a voice-mail message indicating that Bramlett's blood tests were abnormal, signaling that Bramlett was suffering internal bleeding. *Id.* Phillips did not check his voice-mail before leaving the hospital. *Id.* By the time Phillips was finally reached and returned to the hospital, Bramlett had already suffered severe complications from a massive amount of blood in her abdomen. *Id.* She eventually died from complications due to post-operative bleeding. *Id.*

At trial, Phillips admitted that "had he gone to the bedside of [Bramlett] and evaluated her clinical condition, she would be alive today. Further, he admitted that, had he checked his voicemail, he would have stayed at the hospital." *Id.* at —, 2007 WL 836871, at *5, 2007 Tex.App. LEXIS 2124, at *17. The court of appeals concluded that this testimony should be treated as a conclusive, judicial admission on the question of negligence and cause in

fact of Bramlett's death. *Id.* at ——, 2007 WL 836871, at *5, 2007 Tex.App. LEXIS 2124, at *16–18 (setting forth factors used when determining whether admission is a quasi-admission or a judicial admission). In reaching this decision, the court considered the following factors: First, the statements were made during trial. *Id.* at ——, 2007 WL 836871, at *5, 2007 Tex. App. LEXIS 2124, at *17. Second, Phillips's statement that had he checked his voice-mail, he would have stayed at the hospital and Bramlett would be alive today, ran contrary to his defensive theory that he was not negligent. *Id.* The court further noted that "[g]iving conclusive effect to these declarations is consistent with the public policy that it would be unjust to allow a party to rely on one factual defense at trial and then, after the trier of fact found against him, to argue a different factual defense." *Id.* at ——, 2007 WL 836871, at *5, 2007 Tex.App. LEXIS 2124, at *17–18. Finally, the court found that Phillips' admissions did not destroy Bramlett's position. *Id.* at ——, 2007 WL 836871, at *5, 2007 Tex.App. LEXIS 2124, at *18.

▉ Similar to *Phillips*, in the present case, Dr. Medina judicially admitted negligence and causation. First, her testimony was given at trial. Second, Dr. Medina's defense theory at trial was that she was not negligent. Nevertheless, Dr. Medina expressly admitted that it was her duty to ensure proper positioning of her patient to avoid injury. On direct examination by her own attorney, she admitted that a doctor should not place a hot IV bag under a person's arm and that such action would breach the standard of care. *See Grider*, 83 S.W.3d at 245–46 (doctor admitted negligence when he testified that "it would fall below the standard of care for a doctor to cut a brachial plexus nerve when he thought he was in the stellate ganglion,"

and doctor admitted these precise actions occurred). Dr. Medina further admitted that the IV bag was the cause of Hart's injury. She stated that Hart was diagnosed with a burn in the exact location as the IV bag, and that regardless of the heat source, the IV bag that she placed under Hart's harm was warm and caused Hart's burn.

▉ Much of the testimony recited above was elicited on direct examination by Dr. Medina's own attorney. Moreover, formal declarations in open court by a party's attorney that are clear, deliberate, and unequivocal can also constitute judicial admissions. *Isern v. Watson*, 942 S.W.2d 186, 200–201 (Tex.App.-Beaumont 1997, pet. denied). In this case, Dr. Medina's attorney made arguments in closing that, if not sufficient themselves as judicial admissions, at the least support our conclusion that Dr. Medina's statements at trial were deliberate, judicial admissions.

▉ Moreover, in conducting a harm analysis, we are entitled to consider how the erroneously admitted testimony was used during trial. During closing, Dr. Medina's counsel emphasized her admissions on standard of care and causation, and he further argued that Dr. Diggdon's testimony was *unnecessary because of Dr. Medina's admissions.* Considering Dr. Medina's arguments at trial, public policy supports our conclusion that Dr. Medina's statements on standard of care, breach, and causation were judicial admissions. Dr. Medina should not be able to resurrect a defense on appeal that she wilfully failed to assert below.

Finally, although Dr. Medina claims that Dr. Diggdon's testimony was the only evidence that the IV bag was hot-an issue that clearly does not require expert testimony-the Harts both testified as much. Further, after arguing that expert testimony was unnecessary, Dr. Medina's attorney

detailed the non-expert evidence demonstrating that the bag was hot when Dr. Medina placed it. He also referenced the Harts' testimony regarding statements by Dr. Medina's nurse and tried to discredit the testimony.

IV. CONCLUSION

Assuming, without deciding, that the trial court erred in admitting Dr. Diggdon's testimony, we find that such error was harmless and did not probably cause the rendition of an improper judgment. TEX. R.APP. P. 44.1(a). Accordingly, we affirm the trial court's judgment.